## State v. Speaks
*[Cite as 7 AOA 63]*

*Case No. 2675*
*Clark County, (2nd)*
*Decided September 4, 1990*

*Stephen A. Schumaker, Clark County Prosecuting Attorney, by David A. Smith, 50 East Columbia Street, Springfield, Ohio 45502, for Plaintiff-Appellee.*

*Robert M. Shipley II, 819 BancOhio Building, 4 West Main Street, Springfield, Ohio 45502, for Defendant-Appellant.*

FAIN, J.

Defendant-appellant Kerry D. Speaks appeals from his conviction and sentence for Aggravated Robbery, with both a firearm specification and a prior felony specification. Speaks contends that the trial court should have granted his motion to suppress eyewitness identification testimony upon the grounds that an array of photographs shown by the police to the identifying witness was unduly suggestive; that the State failed to prove beyond a reasonable doubt that the object used in the commission of the offense was an operable firearm; and that the trial court erred by failing to grant Speaks' motion for a mistrial, based upon prejudicial and irrelevant testimony elicited by the State from one of its witnesses.

We conclude that the circumstances surrounding the showing of an array of photographs to the identifying witness were not unduly suggestive; that there was evidence from which a jury might reasonably find that the object used was an operable firearm; and that, under all of the circumstances, the trial court was within its discretion in striking the prejudicial and irrelevant testimony and instructing the jury to disregard that testimony, hut not declaring a, mistrial. Accordingly, the judgment of the trial court will be affirmed.

I

JoAnn Allen was on duty as the desk clerk at the Days Inn motel in Springfield, Ohio, at 10:45 p.m. when the robbery occurred. There were no other witnesses to the robbery, itself. Allen testified that the perpetrator asked her the price of a room. What happened next is described in her testimony, as follows:

"A. Then I walked over directly in front of him; then he said, 'I want your money.'

"Q. What did--did you respond verbally to that?

"A. I'm embarrassed to say, I said, 'You've got to be kidding.' Then I looked down and he had the gun in a brown paper bag. So I walked back to where the register was--

"Q. All right.

"A. --at this side of the counter?

"Q. Can you describe the gun?

"A. It was a, a long, black barrel of the gun that I saw.

"Q. A long, black barrel?

"A. Um-hmm.

"Q. Are you familiar with guns?

"A. Not at all.

"Q. Do you know the difference between, let's say, an automatic and a revolver?

"A. No, I don't.

"Q. So the best way you could describe the gun, then, wold be it had a long, black barrel.

"A. (Nodded affirmatively.)

"Q Were you able to see a trigger or handle or cylinders?

"A. No.

"Q. How was he holding the gun?

"A. Up against the counter?

"Q.Okay now, can you gesture with your hands?

"A. Well, it was up against the counter; and the bag was like, like he was holding the gun underneath the bag.

"Q. So the bag was partially covering the gun?

"A. Right.

"Q. Concealing it to some extent?

"A. Yes.

"***

"Q. And was he pointing the gun at you?

"A. Yes.

"Q. Okay now after you observed this gun or the long, black or dark barrel, you say that you moved or went someplace?

"A. I stepped over to where the register was. It was about three steps away from where I was standing.

"Q. Okay. And why did you go over there?

"A. I was going to give him the money.

"Q. Okay.

"A. So I opened the register and he followed me over; and I started taking the bills out of the register and putting them in the bag. And he said to me, 'hurry up or I'll shoot.'

"Q. Hurry up or he would shoot?

"A. That's what he said.

"Q. He used the word 'shoot.'

"A. Yes."

Allen gave the perpetrator about $290 in cash. She was then told "to get down on the floor or he would shoot," and she complied. She estimated that the entire incident lasted three to four minutes.

Patricia Blair, who was arriving at the Days Inn to relieve Allen at the counter, literally bumped into the perpetrator on her way from the parking lot to the entrance to the motel. When she subsequently entered the motel, Allen told her about the robbery.

Allen described the perpetrator as a "light, light black man," who "was slight of build and about my height because I didn't have to look up to him." She testified that he had unusually large "heavy lidded eyes."

Blair described the perpetrator as a "light-skinned black man, average size," of "average height. Three days after the robbery, both Allen and Blair were shown a photo array of four persons. Neither made an identification. A week later, Allen went to police headquarters and looked at a "few hundred" photographs. She made no identification.

A month later, Allen and Blair were shown an array of eight photographs that included Speaks' photograph. Robert Kerr, the officer who showed Allen and Blair the photographs on this occasion, testified as follows:

"Q. And were these pictures displayed to the two witnesses together?

"A. No, they were separated at the time I showed it to them.

"Q. So.

"A. As a matter of fact, when I arrived, one of them was on the telephone and one of them look [sic] at it till she got off and then she looked at them.

"Q. So was either witness permitted to learn the --or was the second witness who looked through the photographs, did she, was she told what the first witness had done?

"A. No, she was not.

"Q. Do you remember who looked at them first?

"A. Yes, Patricia Blair looked at the photographs first.

"Q. What did she say when she looked at the photographs?

"A. Well, she looked through the photographs. She picked out Mr. Speaks' picture and continued looking at them; and then she also picked out another picture, which is that of Steven Massie.

"***

"A. *** . And then of the eight photographs, she looked through them again and she was stuck on Mr. Speaks and Mr. Massie, and she wasn't a hundred percent sure on either one. She initialed both photographs.

"***

"Q. Now, the procedure that was then utilized was Joann Allen, or Mrs. Allen, was that the same that you've just described here with Mrs. Blair or was it different?

"A. No, it's the same, same way.

"Q. And what did she do with the photographs?

"A. She looked through the photographs, and Mr. Speaks' picture was also in the middle somewhere; and when she come to Mr. Speaks, she picked it out and said, "That's him." She continued looking at the rest of the photographs and went back to Mr. Speaks' picture and was sure that that was the person who had robbed her in August, and she then initialed on the back of the photograph at my request."

Kerr testified that the reason that Speaks' photograph was shown as part of a photographic array on this subsequent occasion, despite the fact that his photograph had not been included in either of the previous showings, was that Jimmy Ervin had told the police, in the interim, that Speaks had committed the robbery.

Both Allen and Blair made a positive in-court identification. Toward the conclusion of her cross-examination, Allen testified as follows:

"Q. And it was over a month from the time of the actual robbery till the time you first saw that photograph, wasn't it?

"A. Yes.

"Q. Okay. And you saw a lot of people in the meantime in that.

"A. Sir, I'll never forget is [sic] that man's face.

"Q. I would never stand up here and say you were lying, but I'm just saying isn't it possible you were mistaken.

"A. No.

"Q. Isn't it possible that when you're identifying Mr. Speaks in court here today, it isn't from being at the Days Inn but from his photograph that you saw a month later?

"A. No, sir."

Jimmy Ervin, a convicted felon, testified on behalf of the State. Ervin testified that he was a friend of Speaks, and that Speaks had admitted to having committed the robbery.

During Ervin's direct examination, the State explored his motive for having informed on Speaks, and the following testimony was elicited:

"Q. Now, you indicated that you thought Mr. Speaks was your friend.

"A. Yes.

"Q. Or you considered him your friend. What changed your mind?

"A. The night me and my girlfriend went out, you know, and got drunk and come back home, you know and we thought we was safe and everything and she thought she was and she passed out. And the next thing you know, she woke up, somebody was pulling her pants up after they had done screwed her; and I--I don't normally put her clothes back on her, and so that's what made her wake up, and you know, look; and it was Kerry (Speaks)."

At this point, Speaks objected, and the following colloquy occurred out of the hearing of the jury:

"MR. MAYHALL [Speaks' attorney]: Your Honor, I object to the testimony from other bad acts of the Defendant that were not a part of this crime and certainly weren't disclosed to this Defense Counsel until I just heard it now. This is extraordinarily prejudicial information, and I would move for a mistrial and order that that testimony be stricken from the record. I mean

I've never heard this before. You never told me that, did you?

"MR. SMITH [representing the State]: No, I didn't I just--the purpose of asking him the question was basically to explain why he came into court, why he told a month after this crime occurred that he went to the police and told them that the Defendant had told him this, that he was involved in the crime.

"***

"MR. SMITH: Well, I see your point, Rich [Mayhall]. It didn't occur to me, really, it honestly didn't occur to me at the--under the, in the prior acts thing. Actually, all I knew was that he had had sex with her.

"MR. MAYHALL: He said he raped her.

"MR. SMITH: I know that. What I'm telling you is what I knew before was that he had had sex with her. And that's, that's a lot different.

"MR. MAYHALL: Yeah.

"MR. SMITH: I agree.

"THE COURT: The Court will disregard the jury--or instruct the jury to disregard the statement of the alleged acts of the Defendant with the witness's girlfriend.

"MR. SMITH: Okay.

"THE COURT: And I will order them stricken.

"MR. SMITH: Okay.

Whereupon, the trial court instructed the jury, as follows:

"The Court has ordered the response of the witness stricken as to the alleged acts that the Defendant committed with the witness's girlfriend as hearsay and irrelevant to the matter at hand. Accordingly, the jury will disregard the statements as if they never heard them."

The jury found Speaks guilty of Aggravated Robbery, including the firearm specification. Speaks had requested that the trial court consider the prior felony specification, and the trial court found Speaks guilty of that specification. A judgment of conviction was entered, and Speaks was sentenced accordingly. From his conviction and sentence, Speaks appeals.

## II

Speaks' First Assignment of Error is as follows:

"OVERRULING APPELLANT'S PRETRIAL MOTION TO SUPPRESS IDENTIFICATION TESTIMONY WAS ERROR AND DENIED APPELLANT DUE PROCESS OF LAW. THE INITIAL OUT-OF-COURT CONFRONTATION IDENTIFICATION WAS MADE FROM A POLICE PHOTO SPREAD SO UNDULY SUGGESTIVE AND UNNECESSARY THAT IT RENDERED THE IN-COURT TESTIMONY UNRELIABLE GIVEN THE TOTALITY OF THE CIRCUMSTANCES."

Speaks moved to suppress any in-court or out-of-court identification by Patricia Blair or JoAnn Allen, upon the grounds that they were shown an array Of photographs under circumstances that were unduly suggestive. Essentially, Speaks argues that the other photographs in the array were so unlike the description that the array was unduly suggestive in that Speaks' photograph was the only photograph resembling the description; that Blair and Allen were in each other's presence when the photographs were displayed, so that Allen was influenced by seeing Blair pick out two photographs from the array, one of which was Speaks' photograph; and that Blair testified that she assumed, from the fact that the photographic array was shown to her, that the perpetrator's photograph,was included in the array.

We have reviewed the eight photographs included within the array, and we conclude that they are, collectively, not so unlike the description as to make the inclusion of Speaks' photograph within the array unduly suggestive. There are, of course, variations in the features of the subjects shown in the array. If there weren't--if all of the photographs were exactly alike--the array would have no value. Although the subjects in photographs 2 through 6 are darker-skinned than the, subjects in photographs numbered 1, 7, and 8 (Speaks' photograph is number 7), there are variations of color among the subjects in photographs numbered 2 through 6. Furthermore, the description was simply that the perpetrator was a light-skinned Black man. "Light-skinned" is not precisely quantifiable. We cannot say that any of the photographs are definitely inconsistent with that description, even though some depict subjects who are more light-skinned than others.

Although Speaks contends that the record portrays that Allen was in a position to see Blair pick up two photographs from the array, one of which was Speaks' photograph, Kerr, the officer who showed Allen and Blair the photographs, specifically denied that they were shown the photographs in each other's presence. He testified that he brought the photographs to Blair and Allen at their place of employment at the Days Inn motel, but when he was asked whether the photographs were displayed to Blair and Allen together, he responded: "No, they were separated at the time I showed it to them." He specifically

denied that Allen was told the results of Blair's having looked through the photographs. Accordingly, we conclude that there was evidence in the record from which the trial court could have found that Allen's identification of Speaks' photograph could not have been influenced by Blair's identification.

Finally, Speaks argues that the showing of the photographic array was unduly suggestive because Blair testified that she inferred, from the fact that the photographs were being shown to her, that the perpetrator's photograph was, probably included within the array.

Blair and Kerr both denied that Kerr said or did anything to imply that the perpetrator's photograph was included within the array. Blair testified that that was simply a conclusion that she reached from the fact that the photographs were being shown to her. Significantly, she also testified that she had made a similar inference when an array of photographs had been shown to her on a previous occasion; and yet, she did not make an identification on that previous occasion. Furthermore, she did not make a positive identification on the occasion in question. She picked out two photographs, one of which was Speaks' photograph, and admitted that she was unable to make a positive identification. Thus, it would appear that Blair was not unduly influenced by her assumption that the array being shown to her included the perpetrator's photograph.

From all the facts and circumstances, we find that there is evidence in the record to support the trial court's conclusion that the showing of the photographic array to the witnesses Blair and Allen was not unduly suggestive.

Speaks' First Assignment of Error is overruled.

### III

Speaks' Second Assignment of Error is as follows:

"THE AFFIRMATIVE FINDING BY THE JURY THAT APPELLANT POSSESSED A FIREARM OPERABLE OF [SIC] CAPABLE OF BEING MADE OPERABLE WAS NOT BASED UPON THE EVIDENCE. THE STATE HAD NOT PROVEN BEYOND A REASONABLE DOUBT THAT THE IN-STRUMENT BRANDISHED WAS A FIREARM."

The resolution of this Assignment of Error turns upon the proper interpretation of *State v. Gaines* (1989), 46 Ohio St. 3d 65, and *State v Murphy* (1990), 49 Ohio St. 3d 206. specifically,

it turns upon a determination of how much of the holding in *State v Gaines* remains intact after *State v. Murphy*. In *State v. Gaines. supra*, it was held that a finding against a defendant on a firearm specification requires proof beyond reasonable doubt that a firearm was used in the commission of the offense, and that the firearm was operable or could readily have been rendered operable at the time of the offense. In that case, there was testimony that the object used in the commission of a robbery was a gun, but there was no direct proof that the gun was operable. The gun was evidently brandished over a counter, but there is nothing in the opinion to suggest that there was any evidence of a threat or express representation that the gun was capable of being fired. The Supreme Court held that the State had failed to satisfy its burden of proof.

In *State v. Murphy., supra*, an object described by the victim as "a little one-shot silver Derringer" was used in the commission of a robbery. The perpetrator threatened to kill the victim unless the victim complied with the perpetrator's demand to be given the money in the store. The Supreme Court "modified" its holding in *Gaines, supra*, holding that although the State is required to prove beyond reasonable doubt that the firearm used in the commission of an offense was operable or could readily have been rendered operable at the time of the offense, that proof may be in the form of circumstantial evidence, which may include the perpetrator's express threat to shoot the victim.

Although Justice Resnick, writing for the majority in *State v. Murphy, supra*, purported to modify *State v. Gaines, supra*, "as to the type of evidence which is required to prove [a firearm] specification beyond a reasonable doubt," Chief Justice Moyer, in an opinion concurred in by Justice Brown, opined that the Supreme Court's holdings in the two cases are reconcilable. At the other extreme, Justice Sweeney, dissenting, opined that the holding in *Murphy* was completely incompatible with the holding in *Gaines*. It may come as no surprise, then, that we have some difficulty in determining how to reconcile the *Murphy* and *Gaines* cases.

We extract as the essential principle espoused in *State v. Murphy, supra*, the proposition that proof of the use of a firearm to commit an offense, and proof of the firearm's operability, for purposes of a firearm specification, may be supplied by circumstantial evidence--such as the perpetrator's implied representation, in the form of a threat to shoot the victim, that the firearm

is operable--and that, to the extent that the holding in *State v. Gaines, supra*, is inconsistent with that principle, the holding in *Gaines* has been modified.

In the case before us, although there was no direct evidence that an operable firearm was used in the commission of the offense, there was circumstantial evidence to that effect. The victim testified that the perpetrator threatened to shoot her during the commission of the offense. The jury was, free to infer from that threat a representation, by the perpetrator, that he was armed with a firearm capable of firing a projectile and inflicting a wound. In the absence of any evidence to the contrary, the inference is difficult to resist.

Speaks' Second Assignment of Error is overruled.

## IV

Speaks' Third assignment of Error is as follows:

"OVERRULING APPELLANT'S MOTION FOR MISTRIAL WAS PLAIN ERROR WHERE STATEMENTS BY STATE'S WITNESS JAMES ERVIN ACCUSED APPELLANT OF RAPING HIS GIRLFRIEND. THESE STATEMENTS WERE IRRELEVANT OTHER ACTS PREJUDICIAL TO APPELLANT DENYING HIM DUE PROCESS OF LAW."

Immediately following Ervin's testimony suggesting that Speaks had raped Ervin's girlfriend, Speaks moved "for a mistrial and ordered that that testimony be stricken from the record." Following the ensuing colloquy, the trial court indicated its intention to instruct the jury to disregard the statement. Speaks' attorney neither assented to nor dissented from the trial court's expressed intention to instruct the jury to disregard Ervin's statement, and the trial court proceeded to instruct the jury accordingly.

In the colloquy following Ervin's testimony, the prosecutor indicated that he was surprised by the testimony; he represented to the trial court and opposing counsel that he had expected Ervin to testify simply that Speaks had had sexual intercourse with Ervin's girlfriend, and that was why Ervin decided to inform on Speaks, who, up to that time, had been Ervin's friend. Thus, it appears that the interjection of the rape allegation was without any premeditation on the part of the State.

Furthermore, as the State points out, the trial court could have construed Speaks' motion to have sought, in the alternative, either a mistrial or an instruction to the jury to disregard this statement. Accordingly, when the trial court expressed its intention to instruct the jury to disregard the statement, and then did so, without any further objection or protest from Speaks, the trial court could reasonably have concluded that Speaks was satisfied with the curative instruction that Speaks had requested.

A decision whether to grant a motion for a mistrial is confided to the sound discretion of the trial court. *State v. Scott* (1986), 26 Ohio St. 3d 92, 96; *State v. Reynolds* (1988), 49 Ohio App. 3d 27. Under all of the circumstances of this case, we are satisfied that the trial court was within its discretion in deciding that the prejudicial effect of Ervin's testimony concerning Speaks' rape of Ervin's girlfriend could be cured by an instruction to the jury to disregard that statement, and did not require a mistrial.

Speaks' Third Assignment of Error is overruled.

## V

All of Speaks' Assignments of Error having been overruled, the judgment of the trial court will be affirmed.

BROGAN and GRADY, J.J., concur.