OPINION
On December 19, 1995, defendant-appellant, John Barefield, was indicted for aggravated murder and aggravated robbery in connection with the death of Ronald Gosser. The indictment contained several death penalty specifications which alleged that appellant had killed Gosser during the commission of an aggravated robbery; to avoid detection, apprehension, trial, or punishment for aggravated robbery; or to prevent Gosser from testifying in a criminal proceeding. The indictment also charged appellant with one count of felonious assault in connection with the shooting of another man, Barry DiAngelo. Each count of the indictment also contained a separate firearm specification pursuant to R.C. 2941.141. Appellant entered not guilty pleas to all of the charges and the case was tried to a jury in the Butler County Court of Common Pleas in April 1996.
The state presented testimony from numerous witnesses at trial. Barry DiAngelo testified that he went to an apartment complex in Hamilton, Ohio during the early morning hours of November 13, 1995 to purchase drugs. DiAngelo testified that he was sitting in his car in the parking lot of the apartment complex at approximately 3:00 a.m. when two men robbed him at gunpoint and then shot him in the side two times. DiAngelo survived the gunshot wounds by immediately driving himself to Hamilton Police headquarters where officers summoned medical assistance.
DiAngelo testified that he did not see the face of either of his assailants because both men were wearing ski masks. DiAngelo denied that he had previously refused to identify the two men who had attacked him to police because he feared retribution.
Ronatta Pruitt testified that she was in her living room watching television during the early morning hours of November 13, 1995 when she heard a gunshot in the parking lot of her apartment building. Pruitt looked out her kitchen window and saw appellant firing a gun into a car. Pruitt testified that appellant's face was visible and that appellant was not wearing any type of ski mask or other disguise. Pruitt also testified that the car appellant fired at eventually drove away at a high rate of speed. Pruitt made no attempt to report the shooting to police, but instead returned to her living room and continued to watch television.
Hamilton Police Lieutenant Joseph Murray testified that he was on patrol at approximately 3:00 a.m. on November 13, 1995 when he received a radio report that a man with a gunshot wound had just arrived at police headquarters. Murray testified that he immediately responded to police headquarters, but that he was "flagged down" at a gas station by Ronald Gosser while in route. Gosser told Murray that he had just witnessed a shooting and asked if the two men could speak in a less conspicuous location because he was afraid the perpetrators of the crime might see him with police. Murray and Gosser then drove to the deserted parking lot of a law office where they spoke in apparent privacy. Gosser told Murray that the perpetrators of the crime were three African-American males who had fled in a light blue Cadillac. Murray instructed Gosser to go to his home and remain there until contacted by police.
Tina Weigel, a police dispatcher, testified that she received a 9-1-1 emergency call from Ronald Gosser at approximately 3:42 a.m. on November 13, 1995. Weigel testified that Gosser had placed the call from a public telephone at 55 Pershing Avenue in Hamilton. Gosser told Weigel that he had located the men who had shot DiAngelo and that they were approaching him on foot. Weigel dispatched police to Gosser's location and then listened and spoke intermittently with Gosser while Gosser was accosted by the suspects. Weigel also testified that she heard several gunshots just before the telephone call terminated.
A printed transcript of the 9-1-1 call received by Weigel was also offered into evidence by the state. The relevant portions of the transcript provide as follows:
Weigel: Police-Fire Dispatch, Weigel.
 Gosser: Yes, ma'am, I just wanted to report I told an officer about a Cadillac, okay, its sitting behind Chestnut, okay, in Riverside Homes, as you go around the bend, and it looks like there still might be somebody sitting in there.
 And that's the Cadillac I saw, you know, that picked 'em up, and I told the officer.
Weigel: Well, they just chased * * *
 Gosser: I know, but the one they chased ain't [sic] the one that picked 'em up.
Weigel: And its * * * where's it at?
 Gosser: It's in Riverside Homes, uh, right off of Front Street, right behind Chestnut, oh, oh shit, okay, forget it, have 'em come down, uh, the road real quick, because there's the two dudes that did it they're running my way.
* * *
 Weigel: Alright, do you know their names or anything?
 Gosser: No, but, okay, they're running along * * * they're running along this building, the one who touched the gun, running, he's got a flannel shirt, a checkered shirt on.
* * *
Weigel: Are they right there with you?
Gosser: Yeah.
 Weigel: Alright, just * * * I got the police coming there.
 Gosser: Uh, alright. [to suspects] So what time did that happen? About 3? 3 or 4? [scuffle] No dude. please.
* * *
Suspect: How much money you got on you?
 Gosser: I don't got [sic] my money on me, man.
Suspect: How much you got?
 Gosser: None, man [phone drops, shots fired].
Linville Hall testified that he was sitting in a parked car on Chestnut Street in Hamilton attempting to purchase cocaine during the early morning hours of November 13, 1995. Hall testified that he heard a gunshot which caused him to look toward a group of men crowded around a nearby public telephone. Hall testified that one of the men immediately collapsed and fell to the ground. Hall stated that appellant stepped forward at that point and fired several more shots into body of the man who had collapsed.
Ashley Gaither testified that she and her husband, Rameece Collier, were driving in the area of Front Street and Pershing Avenue during the early morning hours of November 13, 1995. Gaither testified that Collier directed her attention to a group of four men standing near a public telephone. Gaither testified that appellant and two other men, Lawrence Jones and Lahray Thompson, had surrounded another man who was talking on the telephone. Gaither testified that she saw appellant shoot the man talking on the telephone in the back of the head at point-blank range. Gaither stated that she covered her eyes at that point, but that she heard several more gunshots. Neither Gaither nor Collier contacted police.
Dr. Richard Burkhardt, the Butler County Coroner, testified that he performed an autopsy on the body of Ronald Gosser after it was discovered by police near the public telephone at 55 Pershing Avenue. Burkhardt testified that Gosser's death was caused by a gunshot wound to the back of the head. Burkhardt also testified that Gosser had been shot six other times in the chest.
Appellant testified at trial in his own defense. Appellant claimed that he had gone to his girlfriend's house in Cincinnati at approximately 3:00 a.m. on November 13, 1995 and that he did not return to Hamilton for two or three days. Appellant denied any involvement in the crimes perpetrated against DiAngelo and Gosser.
The jury convicted appellant of aggravated murder, aggravated robbery, and felonious assault with the accompanying firearm specifications. The trial court then proceeded with the penalty phase of the proceedings pursuant to R.C. 2929.03. The jury recommended that appellant be sentenced to life imprisonment with parole eligibility after thirty years for the aggravated murder.
The trial court sentenced appellant to life imprisonment with parole eligibility after thirty years for the aggravated murder, a concurrent ten to twenty-five year term of imprisonment for aggravated robbery, and a consecutive twelve to fifteen year term of imprisonment for felonious assault. The trial court also imposed two additional consecutive three-year terms of actual incarceration because the jury had specifically found that appellant was in possession of a firearm at the time he committed the crimes against Gosser and DiAngelo. Appellant now appeals setting forth the following assignments of error:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION FOR A MISTRIAL BASED ON IMPROPER DISPLAY BY THE RELATIVES OF ONE OF THE VICTIMS.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION FOR A MISTRIAL REGARDING IMPROPER FINAL ARGUMENTS.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTIONS TO DISMISS, PURSUANT TO RULE 29 AND WHEN IT ENTERED A JUDGMENT OF CONVICTION ON ALL COUNTS.
In his first assignment of error, appellant contends that his right to a fair trial was prejudiced because several spectators wearing buttons which bore pictures of Gosser were present in the courtroom and in other areas of the courthouse before the proceedings began on the second day of trial. Appellant argues that the trial court should have held a hearing to determine whether any of the jurors saw and were prejudiced by the spectators' buttons and then, if so, declared a mistrial.
"The granting or denying of a mistrial under Crim.R. 33 rests within the sound discretion of the trial court. * * * An appellate court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice." State v. Sage (1987), 31 Ohio St.3d 173, 182. The granting of a mistrial is only necessary where a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127.[1]
A mistrial should not be granted merely because some minor error or irregularity has arisen. State v. Reynolds (1988), 49 Ohio App.3d 27,33.
Appellant relies upon State v. Phillps (1995), 74 Ohio St.3d 72, in which the Ohio Supreme Court adopted and approved the rule enunciated by the United States Supreme Court in Remmer v. United States (1954), 347 U.S. 227, 229, 74 S.Ct. 450. Remmer and Phillips held that whenever a trial court learns of any improper outside communication with the jury, it must hold a hearing to determine whether the communication biased the jury and then, if so, declare a mistrial. 374 U.S. at 230, 74 S.Ct. at 451-52;74 Ohio St.3d at 88-89. See, also, United States v. Zelinka (1988, C.A. 6), 862 F.2d 92, 94-95; State v. James (Aug. 22, 1994), Stark App. No. 94-CA-0046, unreported.
The record shows that the jury arrived at the courthouse at approximately 8:45 a.m. on the second day of trial. Court personnel immediately sequestered the jury in a separate courtroom which was not in use at that time. The trial judge subsequently learned that several of the spectators present in the courtroom where the trial was being held were wearing buttons on their clothing which bore pictures of Gosser. The trial judge took the bench at approximately 9:20 a.m. and addressed the courtroom as follows without the jury present:
 Now, there are members and spectators who have those pictures on. You're ordered out of the courtroom instantly with those. You know what you're going to do as a result of that? You're going to cause a reversal in this proceeding when it gets to the Supreme Court, and we're going to be back here doing this again.
 This is not a place for demonstration. This is a court of law. I don't want you people wearing pictures out in the audience or out in the corridor, because the jurors pass between here and there. This Court — they are admonished not to allow sympathy or bias or interest to interfere with their decision. Any involvement with our jurors, any outward approach to influence their conduct will cause a reversal in the Supreme Court, and we're going to be all back here again in two or three years.
 So, you take care of that right away. Make no attempt, whatsoever, to influence this jury. You are simply spectators. You will say nothing, you will do nothing to show where your interests are in this case, or we're going to be back here doing this whole thing all over again.
The trial judge took a short recess at that point to give the spectators an opportunity to comply with the order and then brought the jury into the courtroom and proceeded with the presentation of the evidence.
As these facts aptly demonstrate, there is nothing in the record which indicates that any member of the jury saw the spectators wearing the buttons which bore Gosser's picture either in the courtroom or at any other location in the courthouse. The trial court was not obligated to conduct a Remmer hearing or to declare a mistrial under these circumstances since there was no evidence that any of the spectators displayed the buttons in the jury's presence or attempted to contact any of the jurors. Accordingly, we find no abuse of discretion by the trial court. Appellant's first assignment of error is overruled.
In his second assignment of error, appellant contends that the trial court should have declared a mistrial because of prosecutorial misconduct during closing arguments. The relevant inquiry a reviewing court must apply in assessing the validity of a claim of prosecutorial misconduct is: (1) whether the prosecutor's remarks were indeed improper; and (2) if so, whether a substantial right of the accused was adversely affected. State v. Lott (1990), 51 Ohio St.3d 160, 165; State v. Blankenship (1995), 102 Ohio App.3d 534, 555.
A prosecuting attorney has wide latitude to summarize the evidence and zealously advocate the state's position during the closing argument portion of his or her case. State v. Richey (1992),64 Ohio St.3d 353; 362; State v. Rahman (1986), 23 Ohio St.3d 146,154. The propriety of a particular remark by the prosecutor must be judged in light of the overall tenor and context of the entire closing argument. State v. Slagle (1992), 65 Ohio St.3d 597,607; State v. Moritz (1980), 63 Ohio St.2d 150, 157. Improper remarks during closing argument are grounds for reversal only when the remarks serve to deny the defendant a fair trial. State v. Maurer (1984), 15 Ohio St.3d 239, 266.
Appellant argues that the following comments by the prosecutor were improper:
 Ronald Gosser was on the phone when he got shot and killed. He was on the phone to you, to every one of you, asking you to do justice with this verdict, asking you to return the only verdict that the facts of this case and the law of this case call for. And that's the verdict that the Defendant is guilty of what he's charged with.
The above-quoted comments by the prosecutor were well within the scope of a proper closing argument. The prosecutor's statement that Gosser was shot and killed while on the telephone with the jury "asking [it] to do justice," while certainly colorful and creative, did not prejudice appellant's right to a fair trial by encouraging the jury to base its verdict on anything other than the evidence. Such argumentation does not deprive the defendant of his right to a fair trial, but is instead the hallmark of effective advocacy. Therefore, the prosecutor did not commit professional misconduct during this portion of his closing argument.
Appellant also argues that the prosecutor improperly interjected his own personal opinion into his closing argument as follows:
 Now, am I telling you that Ronald Gosser was a number one citizen of the year? I've not said that. We have not presented that to you. However, he is dead now, isn't he? And he's dead because he called the police to report a crime. And I don't think it's right, ladies and gentlemen, to start out the defense of the case by saying bad things about Ronald Gosser, about him being a drug addict and a crack addict.
The prosecutor's assertion that he did not think it was right for opposing counsel "to start out the defense of the case by saying bad things about Ronald Gosser" was clearly an improper expression of personal opinion. However, there is nothing in the record which persuades us that this innocuous and somewhat technical error by the prosecutor adversely affected any of appellant's substantial rights or in any way contributed to the guilty verdicts in this case. Accordingly, we find no evidence of any prosecutorial misconduct which would warrant the reversal of appellant's convictions. Appellant's second assignment of error is overruled.
In his third assignment of error, appellant contends that the trial court erred in overruling his Crim.R. 29(A) motion for acquittal because the state failed to present sufficient evidence that he was actually the person who shot DiAngelo and Gosser. Crim.R. 29(A) provides, in part, as follows:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.
A trial court's function in ruling on a Crim.R. 29(A) motion for acquittal is to examine all of the evidence admitted at trial and to then determine whether reasonable minds could reach different conclusions as to whether all material elements of the offense were proven beyond a reasonable doubt. State v. Apanovitch (1987), 33 Ohio St.3d 19, 23.
The record indicates that the state presented extensive testimony at trial from eyewitnesses who personally observed appellant shoot DiAngelo and Gosser. The jury could certainly have concluded from this testimony that appellant was the perpetrator of the felonious assault against DiAngelo and the aggravated murder of Gosser. Therefore, the trial court did not err in overruling appellant's Crim.R. 29(A) motion for acquittal. Appellant's third assignment of error is overruled. The judgment of the trial court is hereby affirmed.
WALSH, P.J., and YOUNG, J., concur.
[1] In the interest of brevity, we have omitted the subsequent case history of those Ohio decisions cited herein. Our research shows that none of these cases have been granted certiorari by the United States Supreme Court.