THE STATE OF OHIO, APPELLEE, *v.*
REYNOLDS, APPELLANT.

(No. 87-CA-98—Decided
June 10, 1988.)

*Joseph Fodal,* city prosecutor, for appellee.

*Arthur L. Sidell III,* assistant county public defender, for appellant.

FAIN, J. Defendant-appellant, William R. Reynolds, appeals from his convictions and sentences for assault, abusing harmful intoxicants, and resisting arrest. Reynolds, who pled in the alternative not guilty and not guilty by reason of insanity, contends that the trial court erred when it withdrew the insanity issue from the province of the jury and refused to instruct the jury concerning the insanity defense. Reynolds also contends that the trial court erroneously permitted statements made by Reynolds in the course of a psychological examination pursuant to R.C. 2945.39 to be used against him on the issue of guilt.

We conclude that the particular statements made during the course of his psychological evaluation, to the introduction of evidence of which Reynolds objected, were relevant to the issue of whether he was legally insane at the time of the offense, so that they were properly admitted in evidence on that issue. However, we agree with Reynolds that there was enough evidence on the issue of his insanity defense to require that it be submitted to the jury with proper instructions. Therefore, the judgment of the trial court will be reversed, and this cause will be remanded for a new trial.

I

One summer night in 1987, around 9:00 p.m., Reynolds was at the home of Nancy Drake. Drake had her eight- or nine-month-old baby boy with her. Drake's brother, Steven Watson, arrived at the home and detected, as soon as he opened the door, the strong smell of enamel spray paint. Upon inquiring, Watson was told by Reynolds that he and Drake were spray-painting a dresser.

A short while later, Watson, who was then in the kitchen, was joined by his sister and Reynolds. Watson told them that the baby should not be in the house because of the paint fumes. At this point, Watson noted that Reynolds was spraying the paint on a sock and putting it to his nose and sniffing it. Watson said that this happened four or five times. Watson testified that Reynolds exhibited all the characteristics of intoxication.

Watson then went across the

street and called the police. When Officer Randy Loper responded to Watson's call, he, also, detected a paint odor that was so strong that it hurt his lungs. Loper also testified that Reynolds appeared to be intoxicated. Loper told Reynolds that he was under arrest for abusing harmful intoxicants, whereupon Reynolds told Loper "that he wasn't going to go to jail, that he had just got out of jail and was not going to go back, and that he had been fed up with the cops and he was not going to go to jail."

Loper and Watson both testified that after Loper's attempts to reason with Reynolds failed, Reynolds resisted arrest to the extent of kicking and struggling with Officer Loper. At some point, another police officer, Grover Songer, arrived to assist. Songer took Nancy Drake into custody, and, like Loper, encountered violent resistance. The events surrounding the arrest were best described by Officer Loper, as follows:

"Q. While this was taking place, was he saying anything or were you saying anything to him or what?

"A. I can't remember if he was saying anything. I had my hands full as it was.

"Q. What exactly was he doing at that point as you went to the floor?

"A. He was kicking and swinging and I was being kicked in the back.

"Q. By whom?

"A. Ms. Drake.

"Q. Where exactly did Mr. Reynolds kick you and how many times approximately did he kick you?

"A. Several times. I was kicked in the chest, and when I finally got on top of him, I was hit with his arms across the arms and the back and chest area. And when I finally got him to the floor, Officer Songer was able to help me. We got the cuffs on him in front.

"Q. You handcuffed him in front?

"A. I couldn't get his arms behind him. He was fighting too much. I had to settle for just getting the cuffs on the front of him.

"Q. From the time you first grabbed him above the wrist until the time you actually got the handcuffs on him, how many seconds or how many minutes went by approximately?

"A. I tried to talk to him for five minutes to cooperate and not resist. Then when he started resisting, we probably was [sic] in the bedroom for another two or three minutes.

"Q. After you got the handcuffs on him, describe to the Jury what you did and what happened.

"A. I tried to pick him up. I used my PR-24.

"Q. What is that?

"A. A nightstick, side-handled baton. I tried to use the PR-24 to get him in an arm bar.

"Q. What does that involve?

"A. Basically, you put the long portion of the side-handled baton in his arm and twist him around and try to lift him up. It is easier to handle a person or carry a person out of the house that way.

"Q. Were you able to do that?

"A. For a little while.

"Q. Then what happened?

"A. He kept spinning and spinning out of it. Then, I tried picking him up physically, and he just kept swinging, like this, and kicking.

"Q. For the record, you are indicating that he raised his hands?

"A. Yes. He had the cuffs in front of him. It is best to get them behind, if you can, but we were only able to get them in the front. And he was using his hands swinging.

"Q. Did he make contact with you?

"A. Yes.

"Q. Where did he actually touch you?

"A. In the chest and arm area.

"Q. What was he doing with his feet at this time?

"A. When he was on the floor, he was kicking, and when he was standing up, he was still trying to kick, one foot at a time, toward us. He was just, basically, going wild and running around and trying to get away. Eventually, we just had to carry him out.

"Q. Who helped carry him?

"A. Well, I had to drag him for part of the way, because Officer Songer had his hands full with Nancy Drake, trying to control her. So, I drug [sic] him out partially. I got him outside. I tried to stand him up again, tried to walk him to the cruiser, and he just continued to spin around and try to get out of my hold, and we were just spinning around in the yard. Finally, I had to put him back on the ground and had to drag him to the cruiser. Officer Songer and myself had to lift him up and put him in the cruiser.

"Q. Did he calm down after he was in the cruiser?

"A. No, he was hitting and kicking inside the cruiser door, and yelling and screaming.

"Q. Did he calm down after you took him back to the police department?

"A. No, sir.

"Q. What happened after you got him back to the Fairborn Police Department?

"A. Sgt. Gardner had arrived on the scene prior to his going. He followed me into the station. Inside, we got him inside the station and took him directly back to the cell, patted him down and took him directly back to the cell so we didn't have to fight him anymore. Got him back there. The whole time, he was screaming and yelling that he was going to kick my ass. He was asking Sgt. Gardner if he would give William Reynolds five minutes with me. He wanted five minutes with me in the cell. He was just wild.

"Q. I know this may be hard for you to say, but can you say, up to the time you got him to the cruiser, how many times did he actually swing at or attempt to hit you and make contact, and by that, I'm also including, too, legs and arms or both?

"A. I would say he probably attempted 25 or 30 times to strike me. How many times he did strike me through the fight and everything, I can't remember how many times he did strike me, but he just continually kicked and swung his arms."

Police Sgt. Gardner also testified. He testified that he had observed Reynolds on a number of occasions, and that Reynolds behaved in a reasonable way when he was not sniffing paint, but was a "wild man" when he was sniffing paint.

Dr. Jasmine Edwards, the licensed psychologist who examined Reynolds pursuant to R.C. 2945.39, testified that Reynolds had a long history of treatment in psychiatric treatment facilities and chemical dependency treatment facilities. Dr. Edwards testified that Reynolds is on two medications, Stelazine and Cogentin, both of which are antipsychotic drugs that are sometimes used with individuals who experience hallucinations or delusions. She testified that it was her understanding that Reynolds had been diagnosed as a schizophrenic, and that schizophrenia is a confused mental state in which the schizophrenic experiences difficulties in adjusting his perceptions of the world to what is actually going on around him. She also testified that schizophrenics experience those symptoms sporadically, "so it is not a condition that will constantly have symptoms appearing in the person."

Dr. Edwards, who was called by Reynolds, testified on cross-examination as follows:

"Q. All right. And as a result of your speaking to him and your evaluation of him [Reynolds], did you form an opinion as to whether he was suffering

from an actual mental illness or legal insanity at the time of the incident in this particular case?

"A. My judgment is that William [Reynolds] is psychologically troubled but not insane."

Dr. Edwards testified that although she did not make a diagnosis, it was her belief that the chemicals Reynolds inhaled could have influenced his behavior with the arresting officer. She testified that he had the means of controlling himself, by means of the drugs that had been prescribed for him, but she also testified that she did not know whether those drugs were available to him at the time of the offense. She further testified that there was a likelihood that his "symptoms" were "substance induced."

On cross-examination, the prosecutor asked Dr. Edwards if Reynolds had told her generally why he uses inhalants. Reynolds objected to this question, but his objection was overruled. Dr. Edwards responded that:

"He said that he uses the drugs, the inhalants, primarily for two reasons: One, is to forget the past, and the other is to eliminate some of the painful memories and painful experiences."

Reynolds' only other witness was his sister, Betty Spencer. Spencer testified concerning Reynolds' extensive history of hospitalization for mental illness, and his use of the antipsychotic drugs, Stelazine and Cogentin.

Spencer testified concerning whether Reynolds was on his prescribed medication at the time of the incident, as follows:

"Q. And do you know of your own knowledge whether he was on those medications, actually taking those medications, on the date of this incident?

"A. Not that I know of.

"Q. He was not taking them?

"A. No.

"Q. How are you aware of that?

"A. Well, just three days before that, he had just got released from Greene County jail. While he was in jail, he was on the medicine."

Based on her observations of her brother's behavior, Spencer testified as follows:

"A. Well, when he is not taking that medication, it is kind of hard to explain it. He's got a different, a whole different personality. It is like he is two different people.

"Q. As to specific acts of conduct, can you tell me some of the things that he does when he doesn't take the medication?

"A. Well, quite a few occasions I have observed him when he ain't on his medicine, he will argue with the TV and he'll want people to come out of the TV to start fighting with him, and then, he'll start crying and getting all nervous and everything, and then, he'll ask for help to try to get the medicine for him to take."

At the close of all of the testimony, the prosecutor moved that the jury be instructed not to consider the insanity defense because of a total lack of proof. Reynolds' attorney argued against the motion, contending that there was sufficient evidence to get to the jury on the insanity issue. The trial court sustained the prosecutor's motion, instructed the jury that it was removing the insanity issue from the jury's consideration, and did not instruct the jury concerning the insanity defense.

Reynolds was found guilty of assault, abusing harmful intoxicants, and resisting arrest, and was sentenced accordingly. From his convictions and sentences, Reynolds appeals.

II

Reynolds' first assignment of error is as follows:

"The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution; and Ohio Revised Code Section 2945.11 guarantee the accused a jury charge that instructs the jury as to the defense theory of the case. The failure of the trial court to instruct the jury as to the insanity defense violated these constitutional and statutory protections."

Essentially, Reynolds argues that the trial court erred by refusing to submit his insanity defense to the jury.

To begin with, the "insanity defense" has been defined as follows:

"In order to establish the defense of insanity, the accused must establish by a preponderance of the evidence that disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, either he did not know that such act was wrong or he did not have the ability to refrain from doing that act." (Footnotes omitted.) *State* v. *Staten* (1969), 18 Ohio St. 2d 13, 21, 47 O.O. 2d 82, 87, 247 N.E. 2d 293, 299.

When from the evidence reasonable minds may reach different conclusions upon the question of insanity, such question of fact is for the jury. If, however, after giving the evidence the most favorable interpretation in favor of the defendant, reasonable minds can come to but one conclusion and that conclusion is adverse to defendant, it is the trial court's duty to rule on the issue as a matter of law. *State* v. *Ross* (1952), 92 Ohio App. 29, 49 O.O. 196, 108 N.E. 2d 77, paragraph six of the syllabus.

In this case, the defense failed to present expert testimony to establish that the defendant was legally "insane" as defined above at the time of the commission of the offense. Indeed, the licensed psychologist called by Reynolds testified on cross-examination that he was legally sane at the time of the offense.

Reynolds argues, however, that there is other evidence in the record, in the form of lay testimony, from which a reasonable juror might conclude that Reynolds' reason was so impaired by disease or other defect of the mind at the time of the criminal act that he either did not know that such act was wrong, or did not have the ability to refrain from doing the act.

The lay testimony in this case would seem to support either one of two inferences. Either the inhalants that Reynolds sniffed altered his behavior to the extent that he became a kicking and flailing savage, or his going off his prescribed antipsychotic medication did so. It is, of course, possible that both circumstances influenced his behavior. The first inference would not support an insanity defense. *State* v. *Mosher* (1987), 37 Ohio App. 3d 50, 523 N.E. 2d 527. The second inference would, however, seem to be a classic defense of insanity.

There is evidence to support the inference that Reynolds was suffering from a severe mental disorder, which required his constant use of antipsychotic drugs, namely, Stelazine and Cogentin. Furthermore, looking at the testimony of Reynolds' sister, Betty Spencer, in a light most favorable to the defendant, as we must, her testimony was that he had been off his medication for three days prior to the offenses, and that he becomes wildly irrational and aggressive when he is off his medication.

The interesting issue in this case is whether lay testimony may be sufficient to permit a jury to infer that a defendant's reason was so impaired by disease or other defect of the mind at the time of the criminal act that he either did not know that such act was wrong or he did not have the ability to refrain from doing that act, the legal

definition of "insanity" in Ohio. We have not found any Ohio cases on this point, but Reynolds directs our attention to *State* v. *Bay* (1986), 150 Ariz. 112, 116, 722 P. 2d 280, 284, in which the Supreme Court of Arizona held that where a lay witness has had the opportunity to observe the past conduct and history of the defendant, the fact that he is a lay witness goes not to the admissibility of the testimony, but rather to its weight, and a jury is free to accept that lay testimony as a basis for its verdict, even when there is conflicting medical testimony on the issue.

In this case, Reynolds' sister was not called upon to give an expert opinion as to whether Reynolds was legally insane at the time of the commission of the offense. She merely testified out of her own personal knowledge that he had been off the medication for three days prior to the commission of the offense, and that he becomes wildly and aggressively irrational when he is off his medication. While expert testimony is useful to assist a jury in determining a disputed issue of fact that involves scientific or other expertise, it is only admitted for the purpose of assisting the jury in that regard. Where the jury has competent testimony from lay witnesses that would permit the jury to conclude that a defendant's reason was so impaired by disease or other defect of the mind at the time of the criminal act that he either did not know that such act was wrong, or did not have the ability to refrain from doing that act, a jury is permitted to so find.

In this case, we conclude that there was enough evidence to permit a reasonable juror to find that Reynolds was legally insane at the time of the commission of the offense. Therefore, it was error for the trial court to withdraw the insanity defense from the jury and refuse to instruct the jury concerning the insanity defense.

Reynolds' first assignment of error is sustained.

## III

Reynolds' second assignment of error is as follows:

"The state of Ohio in this trial of these cases violated the provisions and protections provided by Ohio Revised Code 2945.39(D) which provides, 'no statement made by the defendant in an examination or hearing relating to his mental condition shall be used in evidence against him on the issue of guilt in any criminal action.' "

Reynolds argues that the trial court should not have overruled his objection when Dr. Edwards, the licensed psychologist who examined him pursuant to R.C. 2945.39, was asked whether Reynolds had told her why, generally, he uses inhalants. Reynolds contends that this violated the provisions of R.C. 2945.39(D), since an element of the offense of abusing harmful intoxicants is that the abuser uses the intoxicant "with purpose to induce intoxication or similar psychological effects." R.C. 2925.31(A).

We agree that the statement of Reynolds concerning which Dr. Edwards testified tended to incriminate him by showing that his purpose, generally, in using inhalants was to become intoxicated. However, there was another purpose for the question. With respect to the charge of abusing harmful intoxicants, Reynolds' insanity defense would be that his decision to use the inhalants was a product of his mental disorder, in the sense that his mental disorder had so impaired his reason that he either did not know that it was wrong to use the inhalants or he did not have the ability to refrain from using the inhalants. The prosecutor's question to Dr. Edwards elicited a reason other than insanity for Reynolds' having used inhalants. For that purpose, the question was proper.

The trial judge restricted the scope of the question to Reynolds' general reasons for using inhalants, rather than his reason at the time of the par-

ticular offense charged, in order to protect Reynolds, as much as possible, from the adverse impact of this testimony on the issue of guilt. Since the testimony was not properly admissible on the issue of guilt it would have been appropriate to have given a limiting instruction, but it would have been a complicated and subtle limiting instruction which would probably only have served to emphasize the testimony in the minds of the jury. Therefore, it is not surprising that Reynolds' attorney did not request a limiting instruction.

Reynolds also claims that it was error for the prosecutor to have referred to this testimony in closing argument, when the issue of Reynolds' insanity had already been withdrawn from the jury. Reynolds' attorney objected and moved for a mistrial as soon as the prosecutor referred to this testimony. Although the trial court overruled the motion for a mistrial, it did instruct the prosecutor that he was not to refer any further to this testimony, and the prosecutor complied.

The granting of a mistrial is within the sound discretion of the trial court. *State* v. *Palmieri* (App. 1938), 13 O.O. 517, 46 N.E. 2d 318, appeal dismissed (1939), 135 Ohio St. 30, 13 O.O. 526, 18 N.E. 2d 985. A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court. *Bowman* v. *Alvis* (1950), 88 Ohio App. 229, 44 O.O. 389, 96 N.E. 2d 605.

While we agree with Reynolds that the prosecutor should not have commented on Dr. Edwards' testimony concerning Reynolds' statement to her as to why he used inhalants, since the insanity defense had been withdrawn from the jury's consideration, we do not consider this misconduct to have been so glaring as to require a mistrial. Perhaps the jury should have been instructed to disregard the prosecutor's comment, but again, that might only have served to emphasize the point in the minds of the jury. Reynolds' attorney did not request such an instruction.

Reynolds' second assignment of error is overruled.

### IV

Reynolds' first assignment of error having been sustained, the judgment of the trial court will be reversed, and this cause will be remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

BROGAN and WOLFF, JJ., concur.