[Cite as *State v. Fenderson*, 2022-Ohio-1973.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No. E-21-018

       Appellee                              Trial Court No. 2019 CR 0393

v.

Takye S. Fenderson                        **DECISION AND JUDGMENT**

       Appellant                             Decided:  June 10, 2022

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Henry Schaefer, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Takye S. Fenderson, appeals the judgment of the Erie County

Court of Common Pleas, convicting him following a jury trial of one count of possession

of drugs, one count of trafficking in drugs, and one count of corrupting another with

drugs.  For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} On November 14, 2019, the Erie County Grand Jury indicted appellant on four counts, including one count of possession of a fentanyl-related compound in violation of R.C. 2925.11(A) and (C)(11)(b), a felony of the fourth degree, one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1) and (C)(9)(c), a felony of the fourth degree, one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a felony of the fifth degree, and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (B), a felony of the third degree. Later, on February 12, 2020, the Erie County Grand Jury indicted appellant on a fifth count, corrupting another with drugs in violation of R.C. 2925.02(A)(3) and (C)(1), a felony of the second degree. Prior to trial, the count of receiving stolen property was dismissed.

{¶ 3} Appellant was initially represented by a public defender. On January 3, 2020, appellant retained attorney Jonathan McGookey to represent him. McGookey moved for leave to withdraw as counsel on April 9, 2020, which the trial court granted. The public defender re-entered his appearance on May 18, 2020. On June 11, 2020, appellant retained attorney Michael Duff to represent him. On July 10, 2020, Duff moved for leave to withdraw as counsel, which the trial court granted. On July 27, 2020, appellant retained attorney R.J. Budway.

2.

**{¶ 4}** On December 15, 2020, the matter was scheduled for a jury trial beginning on May 17, 2021.

**{¶ 5}** On March 19, 2021, Budway moved for leave to withdraw as counsel. On the same day, he also moved for leave to file pre-trial motions to suppress and for a change of venue. A hearing was held on March 23, 2021. At the hearing, it was discussed that following Budway's agreement to represent appellant, appellant was indicted in a separate case on several counts, including murder, which added obvious complexity to Budway's representation of appellant.[1] Budway argued that appellant was not meeting his contractual obligations, and that he needed to be paid within one week in order to be able to adequately prepare for trial. Appellant argued that he was or would be making payments to Budway, and the original agreement was that he would pay Budway before trial. Furthermore, appellant argued that none of his attorneys had filed relevant motions, such as a motion to suppress, despite his request to do so. The court responded to appellant, "[H]e's telling you right now that he needs the money within a week, and if you can't come up with it, then I'm sorry. I can't make him stay on this case." After the state emphasized that the court could force Budway to stay on the case, and noted the court's rule that another attorney has to come on before the current attorney could withdraw, the court informed appellant that Budway was representing him on the case

---

[1] In case No. 2020-CR-0046, appellant was originally indicted on February 12, 2020, with one count of having weapons while under disability, and one count of tampering with evidence. On August 20, 2020, appellant was indicted on additional charges of murder, involuntary manslaughter, and tampering with evidence.

3.

until another attorney entered an appearance. The trial court ended the hearing by giving appellant one week to meet his contractual obligation to Budway, and two weeks to file any pre-trial motions.

{¶ 6} No motions were filed by appellant within the two weeks. On May 10, 2021, one week before the scheduled trial date, the trial court denied Budway's March 19, 2021 motion to withdraw. The next day, appellant filed a motion to suppress evidence discovered during the search of a vehicle. The trial court denied the motion on May 13, 2021, finding that it was untimely.

{¶ 7} Ultimately, the matter proceeded to a four-day jury trial beginning on May 17, 2021. Prior to voir dire, appellant orally moved for a continuance. Budway explained that almost immediately following the March 23, 2021 hearing, appellant requested his case file, which Budway gave to him. Budway did not hear anything further from appellant, and assumed that appellant would be retaining new counsel. Budway then described that on April 27, 2021, he was at court for a separate case, and discussed the matter of his representation of appellant with the court and the state. Budway learned that the trial court was not going to allow him to withdraw, and that he would proceed as appellant's counsel either as private counsel, or as his court-appointed attorney. Around that time, Budway also received supplemental discovery from the state in preparation of trial. Budway contacted appellant, and met with him twice in preparation of trial. Budway argued to the court that he has spent most of his time since

4.

April 27, 2021, attempting to get the case ready for trial, but that he has not had the opportunity to go over the evidence as thoroughly as he would have liked.

{¶ 8} Upon consideration, the trial court commented that appellant has known of the trial date for many months, and did nothing. In particular, despite requesting the case file, appellant did not hire a new lawyer, nor did appellant return to the court and ask for a lawyer to be appointed. Therefore, the court denied appellant's oral motion for a continuance.

{¶ 9} At the trial, the following evidence was presented.[2] Officer Richard Henderly of the Perkins Township Police Department testified that on the morning of August 22, 2019, he responded to a call of an unresponsive male in a home in Erie County. When he arrived at the scene, he was led to an upstairs bedroom where a man was crying on top of another man. The man laying underneath, later identified as 26-year-old Joseph Morgan, appeared to not be breathing and there was red foam coming from his nose and mouth, and which was all over his chest. Joseph was pronounced dead at the scene. The man crying on top of Joseph was his father, Monte Morgan.

{¶ 10} Monte testified that Joseph had recently moved to the area from St. Louis. In July 2019, Joseph admitted to Monte that he had a problem with drug addiction, and Monte helped Joseph check in to a rehab center. Joseph completed the inpatient portion

---

[2] Following the trial, the jury acquitted appellant on the charge of having weapons while under disability. That charge is not a subject of this appeal, and thus we will not discuss the evidence that was presented as it relates to that charge.

5.

of the rehab and was released to outpatient services. He was also given a prescription for Vivitrol.

{¶ 11} Monte testified that sometime around Joseph's stay in rehab, he was driving in his truck with Joseph when a car swerved in front of them, honked, and made a hard left into a parking lot as if trying to get Monte to pull into the parking lot as well. A second or two later, Joseph's phone rang, and Monte overheard Joseph speaking with the person who had just swerved in front of them. Joseph explained to his father that it was a friend from "the Tims"—a local apartment complex—that he goes and visits. Monte identified the driver of the car as appellant.

{¶ 12} On August 21, 2019, Joseph had a fight with his girlfriend, with whom he had recently had a child, regarding the fact that his name was not listed on his baby's birth certificate. Joseph's girlfriend obtained a restraining order against him, and so that night Joseph stayed over at Monte's house. Joseph shared a room with "CJ," Joseph's cousin, who also was staying at Monte's house. Monte testified that he last saw Joseph around midnight when Monte woke up and went into the kitchen to get a snack and a drink. Monte saw Joseph sitting in the kitchen with his phone in his hand and his hand on his head, looking lost and depressed. Monte, knowing of the potential for relapse, went to Joseph and put his arm around him, and put his head against Joseph's, and told Joseph to stay strong and that they would get through the situation.

6.

{¶ 13} The next morning, Monte was awoken by CJ, who told him that something was wrong with Joseph. When Monte entered the room, he grabbed Joseph and realized that Joseph's body was cold. Monte immediately knew that Joseph was dead.

{¶ 14} Monte later met with police detectives, and turned over Joseph's phone, which he found in the bed with Joseph. A few days later, Monte summoned the strength to go into Joseph's room again. Monte picked up the pair of pants that Joseph was wearing the night before he died. Inside one of the pockets were two blue pills. Monte took those pills out of the house and called the police detective.

{¶ 15} Katie McKitrick, the Director of Public Health Nursing at the Erie County Health Department testified that Joseph began voluntary inpatient rehab on July 30, 2019, and was released on August 6, 2019. Upon his release, Joseph was given a 30-day supply of an oral form of Vivitrol. He then had a follow-up appointment on August 15, 2019. Joseph had an additional appointment scheduled for August 23, 2019, the day after he died.

{¶ 16} CJ testified that he became aware that Joseph had a drug problem in July 2019. On several occasions, CJ would accompany Joseph to the Tims. CJ testified that typically he would ride with Joseph over to the Tims, and once there, Joseph would exit the vehicle and meet up with appellant. On one of those occasions, Joseph introduced CJ to appellant. CJ also testified that one time he went with Joseph to a bar in Fremont, which CJ assumed Joseph went into to purchase some items.

7.

**{¶ 17}** CJ explained that he first learned of appellant in April or May 2019, when Joseph returned home from the Convenient Store. Joseph told CJ that he was standing in line when he was approached by appellant. According to CJ, appellant told Joseph that he had heard about him, and wanted Joseph "to stop going through the middleman and just come through him directly."

**{¶ 18}** Perkins Township Police Detective Joe Rotuno testified that he responded to the call of an unresponsive male at Monte's house. Rotuno testified that while there, he recovered a cell phone that was in Joseph's bed at the time he died. The phone was unlocked when he found it, and as Rotuno was examining the contents of the phone, he identified text messages that he understood to be indicative of a drug transaction. Specifically, the text messages began on the evening of August 21, 2019, and continued into the early morning hours of August 22, 2019. The text messages detailed plans to meet, with Joseph stating "I'mma come meet chu I only need 2 for now." Seven minutes later, at 12:48 a.m., Joseph texted "leem know for a crash out fam." Two minutes later, at 12:50 a.m., Joseph received an incoming call from the same number that he had been exchanging text messages with. The incoming call lasted 27 seconds. Seven minutes later, at 12:57 a.m., Joseph made a two-second outgoing phone call to the same number, followed by an outgoing phone call to the same number at 12:58 a.m., which lasted four minutes and three seconds.

8.

**{¶ 19}** Rotuno testified that he then organized a controlled buy on August 23, 2019. Using Joseph's phone, Rotuno texted the same phone number, asking for the "same as last." Rotuno received an immediate response, "Bet." Rotuno then texted the phone number at 2:04 p.m., "I'll be at Convenient in twenty u good." Rotuno received a response at 2:05 p.m., "Yessir." At 2:16 p.m., Rotuno received another response asking "You sure?" Rotuno replied, "Yeah, got 200 now u bump it up." The other phone number responded, "You know you my guy how far are you." After additional messaging, at 2:32 p.m., Rotuno texted "I'm here now." The other phone number responded at 2:33 p.m., "Tims?" Rotuno immediately texted back, "Convenient, down from my dads." At 2:34 p.m., Rotuno received a reply, "Come the Tims." Rotuno responded that he could not go to the Tims because he had his eight-year-old cousin with him. At 2:36 p.m., the other phone replied, "Here I come."

**{¶ 20}** As Rotuno was reading the final text, he looked up and saw appellant coming in a silver car with a cell phone in his hand, heading towards the Convenient Store. Rotuno testified that he had previous knowledge that appellant did not have a driver's license. Rotuno observed appellant park in front of the Convenient Store and wait for about 20 or 30 seconds with the car still running. Appellant then exited the car and approached the doors of the Convenient Store. Appellant opened the doors and looked in the store, but did not go into the store. Rotuno testified that it appeared that

9.

appellant was looking for someone in the store. Rotuno then observed appellant head back towards the silver car.

{¶ 21} At that point, Rotuno made the decision to detain appellant. Rotuno testified, however, that as he was pulling into the parking lot in his unmarked vehicle, appellant recognized him. Appellant then walked past the silver car and headed towards the side of the building, where Rotuno believed appellant would have started running. Rotuno and Detective Ron Brotherton of the Sandusky Police Department were able to detain appellant before that happened.

{¶ 22} According to Rotuno, as soon as he brought up the silver car after detaining appellant, appellant stated, "I wasn't driving that car. I don't know anything -- that's not my car." Rotuno then obtained the cell phone that was in appellant's hand. Using his own phone, Rotuno called the phone number that he had been texting moments earlier to set up the controlled buy, and appellant's phone rang.

{¶ 23} Rotuno then walked by the silver car, which was still running, and observed suspected narcotics that appeared to be packaged for sale, sitting in plain view on the center console of the vehicle. Rotuno seized the narcotics, which he described as 10 pills that were inscribed like pharmaceutical prescription pills, with the inscription "M 30."

{¶ 24} A few days later, on or around Tuesday, August 27, 2019, Rotuno received a message from Monte, informing him that Monte found two pills in Joseph's bedroom.

10.

When Rotuno went to retrieve the pills, Monte was not home, but his brother-in-law showed Rotuno where Monte had secured the pills in the garage. Rotuno testified that the two pills appeared to be almost identical to the pills recovered from the silver car.

{¶ 25} On cross-examination, Rotuno acknowledged that the text messages between Joseph and appellant did not mention any drugs by name, did not mention a quantity other than the number "2", and did not mention a price. Rotuno also admitted that there were no witnesses who observed appellant provide the drugs to Joseph on the night that Joseph died. Furthermore, Rotuno acknowledged that he did not question any of the people living in the house with Joseph as to whether they provided drugs to him. Finally, Rotuno identified a police report from the Ohio State Highway Patrol that indicated that appellant's acquaintance, A.P.—who was also the owner of the silver car—was stopped on June 28, 2019, and was found to be in the possession of five pills that were marked "M 30."

{¶ 26} Ryan Sorrell also testified for the state. Sorrell was an inmate at Marion Correctional Institution. In exchange for his testimony, Sorrell was offered to serve the remainder of his prison sentence at the Erie County Jail. Sorrell testified that while in prison, he heard appellant say something to the effect of "How was I supposed to know it was gonna kill him. He was my best friend." Sorrell clarified that appellant was speaking about the pressed pills, and that appellant did not know that there was something in the pills other than what was supposed to be in them.

11.

{¶ 27} Emily Miller, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified that she analyzed two separate submissions from the Perkins Township Police Department. The first was a group of ten pills, which she described as round and light-green in color. The pills were marked "M 30," which she testified was associated with Oxycodone, but she noticed that they were slightly irregular in shape. Miller's analysis of the pills discovered that they contained fentanyl. The ten pills had a combined weight of 1.10 grams, plus or minus .04 grams. The second submission that Miller analyzed was a group of two pills that were similarly round and light-green in color. The two pills were also marked "M 30," and also tested positive for fentanyl. The two pills had a combined weight of .22 grams, plus or minus .04 grams. On cross-examination, Miller testified that she did not compare the two groups of pills against each other.

{¶ 28} Dr. Cynthia Beisser, a deputy coroner for the Lucas County Coroner's Office, testified that she conducted the autopsy on Joseph. Based upon her examination and the toxicology results, she determined to a reasonable degree of medical certainty that Joseph died of fentanyl toxicity.

{¶ 29} The state's final witness was Dr. Robert Forney, Jr., a forensic toxicologist for the Lucas County Coroner's Office. Dr. Forney testified that based upon the levels of fentanyl and norfentanyl in Joseph's body, as well as the amount of pulmonary edema present, he concluded with a reasonable degree of scientific certainty that Joseph died of

12.

fentanyl toxicity, and that Joseph's death occurred within a short time of his ingesting the drugs.

{¶ 30} Following the state's presentation of evidence, appellant called one witness in his defense. Kyra Amison is appellant's mother. Amison testified that appellant did not live at the apartment in the Tims, which was actually rented by appellant's sister. Instead, according to Amison, appellant lived in Toledo with his grandmother.

{¶ 31} After appellant's presentation of evidence, appellant moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. The court then received closing arguments and instructed the jury, following which the jury returned with a verdict of guilty on the counts of possession, trafficking, and corrupting another with drugs, and not guilty on the count of having a weapon while under disability.

{¶ 32} At sentencing, the state recommended that the counts of possession and trafficking be merged. However, rather than merging those counts, the trial court ordered appellant to serve 18 months in prison on each count, to be served concurrently with each other. The court further ordered those 18 months to be served consecutively to the maximum indefinite sentence of 8 to 12 years on the count of corrupting another with drugs.

## II. Assignments of Error

{¶ 33} Appellant has timely appealed his judgment of conviction, and now asserts six assignments of error for our review:

1. The Trial Court Erred When it Failed to Merge Counts One and Two of the Indictment at Sentencing.

2. The Trial Court Erred When it Failed to Grant Mr. Fenderson's Motion for a Mistrial After an Altercation that Occurred Within the Presence of the Jury.

3. The Trial Court Erred in not Granting Mr. Fenderson's Motion for a Continuance.

4. Counsel was Ineffective in Filing Mr. Fenderson's Motion to Suppress out of Time.

5. The Conviction was Against the Manifest Weight of the Evidence and not Supported by Sufficient Evidence.

6. Mr. Fenderson was Deprived of his Rights to Due Process and Equal Protection When he was Convicted by an All-White Jury.

### III. Analysis

{¶ 34} For ease of discussion, we will address appellant's assignments of error in chronological order from when they arose.

### A. Ineffective Assistance

{¶ 35} In his fourth assignment of error, appellant argues that his trial counsel was ineffective for failing to timely file his motion to suppress.

**{¶ 36}** To prove a claim of ineffective assistance, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Id.* at 697. Applicable here, "[f]ailure to file a motion to suppress constitutes ineffective assistance of counsel only if, based upon the record, the motion would have been granted." *State v. Hernandez*, 6th Dist. Lucas Nos. L-06-1388, L-06-1389, 2009-Ohio-386, ¶ 83, quoting *State v. Kuhn*, 9th Dist. Lorain No. 05CA008859, 2006-Ohio-4416, ¶ 11.

**{¶ 37}** Appellant argues that had counsel filed the motion, the evidence seized from appellant's phone and the pills discovered in the silver car would have been suppressed because the state could not justify appellant's arrest and the search of the car.

**{¶ 38}** The Fourth Amendment to the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Article I, Section 14 of the Ohio Constitution contains almost identical language, and we have interpreted it as

affording at least the same protection as the Fourth Amendment." *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 13.

{¶ 39} "The touchstone of the Fourth Amendment is reasonableness." *Id.* at ¶ 14, quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). "Whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case." *Id.*, quoting *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). "Under the Fourth Amendment, warrantless searches are per se unreasonable without prior approval by a judge or magistrate, subject to only a few specific exceptions." *Id.* at ¶ 15.

{¶ 40} Here, appellant challenges both his detention by the officers and the subsequent search of his vehicle. We will address each in turn, beginning with appellant's detention.

{¶ 41} "Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer who lacks probable cause to arrest may, consistent with the Fourth Amendment, make an investigatory stop, including a traffic stop, of a person if the officer has reasonable suspicion to believe that the person is or is about to be engaged in criminal activity." *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 19. "Reasonable suspicion for a *Terry* stop 'is dependent upon both the content of information possessed by police and its degree of reliability. * * * Both factors—

16.

quantity and quality—are considered in the totality of the circumstances—the whole picture, * * *, that must be taken into account when evaluating whether there is reasonable suspicion.'" (Internal citations omitted) *Id.* at ¶ 20, quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). "Police officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" *Id.*, quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

{¶ 42} Upon review, we find that the officers had reasonable suspicion to stop appellant, during which stop the officers developed probable cause to arrest him. Rotuno used Joseph's phone to contact the person believed to be Joseph's drug dealer. Based upon Rotuno's experience as a narcotics detective, Rotuno set up a drug buy for the "same as last," further instructing the suspected dealer to "bump it up," because he had "200." The text messages established a meeting time and set the Convenience Store as the location for the transaction instead of the Tims. When the suspected dealer messaged "Here I come," Rotuno looked up and saw appellant leaving the Tims in a silver car with a phone in his hand, and heading toward the Convenient Store. Rotuno observed appellant park the silver car in front of the store, wait for 20-30 seconds, and then exit the car and look into the store as if he was looking for someone. As he turned around and left the store, appellant noticed Rotuno. Instead of heading back to the silver car—which

17.

was still running—appellant began walking away. Based upon this evidence, we hold that reasonable suspicion existed to conduct a *Terry* stop of appellant.

{¶ 43} As that stop unfolded, probable cause to arrest appellant developed when Rotuno called the phone number of the suspected drug dealer that he had been texting, and appellant's phone rang, and when the officers noticed pressed pills packaged for sale sitting on the middle console of the silver car. "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment [to the United States Constitution]." *State v. Jordan*, 166 Ohio St.3d 339, 2021-Ohio-3922, 185 N.E.3d 1051, ¶ 2.

{¶ 44} Therefore, we hold that appellant's detention and arrest did not violate his Fourth Amendment right against unreasonable searches and seizures, and as such a reasonable probability does not exist that a motion to suppress based upon his detention would have been granted.

{¶ 45} Turning to the search of the silver car, we first note that the observation of the pressed pills did not constitute a "search." "Modern understandings of the Fourth Amendment recognize that it serves to protect an individual's subjective expectation of privacy if that expectation is reasonable and justifiable." *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 14. "But if the individual does not act to preserve that privacy, such as by leaving an object in the plain view of the public, then the state has not 'searched' within the meaning of the Constitution, because the individual

18.

has exposed those objects to others rather than keeping them to himself." *Id.* at ¶ 15. "Generally, the police are free to observe whatever may be seen from a place where they are entitled to be." *Id.*, quoting *United States v. Fields*, 113 F.3d 313, 321 (2d Cir.1997), citing *Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989).

{¶ 46} In this case, Rotuno and the other officers were entitled to be in the parking lot of the Convenience Store, where they looked through the window of the silver car and noticed the pressed pills packaged for sale. The discovery of the pills, within the context of the totality of the circumstances including the text messages with the suspected drug dealer and appellant's appearance and behavior at the Convenience Store, gave the officers probable cause to believe that the car contained contraband. "Once a law enforcement officer has probable cause to believe that a vehicle contains contraband, he or she may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement." *State v. Moore*, 90 Ohio St.3d 47, 51, 734 N.E.2d 804 (2000), citing *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."). Thus, we hold that appellant's Fourth Amendment rights were not violated by the search of the silver car, and therefore a reasonable probability does not exist that a motion to suppress based upon the search of the car would have been granted.

19.

{¶ 47} Because appellant has failed to demonstrate a reasonable probability exists that a motion to suppress would have been granted if it had been timely filed by trial counsel, appellant has not shown sufficient prejudice, and therefore his claim of ineffective assistance of counsel must fail.

{¶ 48} Accordingly, appellant's fourth assignment of error is not well-taken.

### B. Motion for a Continuance

{¶ 49} In his third assignment of error, appellant argues that the trial court erred when it denied his motion for a continuance, made on the morning of the start of the trial.

{¶ 50} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 51} As recognized by the Ohio Supreme Court in *Unger*:

> In evaluating a motion for a continuance, a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived;

20.

whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Unger* at 67-68.

{¶ 52} In support of his assignment of error, appellant argues that he reasonably believed that he was unrepresented because he had not paid Budway. He further contends that he was not contriving to delay the trial in that it was his attorney who was ineffective for failing to timely file a motion to suppress, and it was the state who produced discovery on the eve of trial. Finally, appellant argues that the trial court exacerbated the situation by conveying to appellant that he had to pay Budway or else Budway would be off of the case, and then later telling Budway outside of the presence of appellant that Budway would remain on the case either as private or appointed counsel.

{¶ 53} Applying the considerations in *Unger*, we find that the trial court did not abuse its discretion when it denied appellant's motion for a continuance.

{¶ 54} First, we note that although the length of the requested continuance was undetermined, it was made on the morning of trial, after witnesses had been subpoenaed and after the jury had reported. Thus, the inconvenience to all stakeholders was high.

{¶ 55} Second, appellant contributed to the circumstances giving rise to the request for a continuance. The trial date had been set for approximately five months.

21.

During this time, appellant's counsel moved to withdraw because appellant was not meeting his contractual obligation. Rather than pay counsel, or return to the court and state that he was indigent, appellant requested his file from Budway and then had no further contact with him. However, appellant learned at the end of April 2021, that Budway was still going to represent him in the upcoming trial on May 17, 2021, and so appellant met with Budway twice between late April and the start of trial. During those three weeks, appellant did not move for a continuance, but waited until the last possible moment on the morning of the trial to request a delay.

{¶ 56} Third, although counsel indicated that he would have liked more time to review the materials and prepare for trial, counsel had been the attorney of record for approximately 10 months, and had been given a three-week notice that he would be representing appellant at trial.

{¶ 57} Fourth, and finally, the production of discovery by the state on the eve of trial was made during the state's own trial preparation, and primarily consisted of medical records from Joseph's detox program that were only marginally relevant to the issues at trial. Tellingly, appellant has made no argument regarding how he was prejudiced by the state's late production of discovery.

{¶ 58} In light of these considerations, we cannot say that the trial court's decision was unreasonable, arbitrary, or unconscionable. Therefore, we hold that the trial court did not abuse its discretion when it denied appellant's motion for a continuance.

22.

**{¶ 59}** Accordingly, appellant's third assignment of error is not well-taken.

## C. Mistrial

**{¶ 60}** In his second assignment of error, appellant argues that the trial court erred when it denied his motion for a mistrial.

**{¶ 61}** "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened." *Id.*, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Instead, "[t]he granting of a mistrial is necessary only when a fair trial is no longer possible." *Id.*

**{¶ 62}** Relevant here, on the second day of trial, during a recess, an altercation between members of Joseph's family and members of appellant's family took place in front of six of the jurors. Following the recess, the court addressed the issue:

[B]efore we proceed and bring the families in, I want to make sure --
I know there was an incident, um, some altercation between the families.
Obviously there's a lot of tension and high emotions running through both
sides. I want to make sure that everyone here would be able to not let
anything that they saw in that incident, if you did see anything, interfere
with your judgment in this case, and I want to be assured that you would be

able to follow the law and make your decisions based upon the evidence in this case and not anything that you saw outside of the Courtroom.

The court then individually addressed the jurors, and each juror indicated that he or she would be able to make a decision based upon the evidence and not what occurred outside of the courtroom. Notably, Juror No. 6 and Alternate No. 2 gave "(No audible response.)" However, when the parties were arguing the motion for a mistrial, the state commented that the court instructed all of the jurors that they are to follow the evidence and only decide the case based upon the evidence, "[A]nd the Court went further and individually voir dired each and every juror, including the alternates, and they all indicated that they could do so." Immediately thereafter, the court replied, "I believe that's correct and so we'll proceed."

{¶ 63} In his brief, appellant argues that Juror No. 6 and Alternate No. 2 did not assent to the court's instruction on the record. We disagree. Although the record does not record an audible response from those two jurors, the prosecutor's uncontested statement, and the court's uncontested affirmance of that statement, demonstrate that the jurors agreed with the trial court's instruction.

{¶ 64} Appellant also argues that the prejudice created by the altercation was self-evident from the fact that the court needed to give a curative instruction. According to appellant, if there was no prejudice, then a curative instruction would not have been necessary. Again, we disagree. The relevant inquiry is not whether appellant was

prejudiced by the event, but whether appellant was materially prejudiced and a fair trial rendered impossible after the curative instruction is considered. Indeed, "curative instructions may not always sufficiently eliminate the prejudicial impact * * *." *State v. Marshall*, 2014-Ohio-4677, 22 N.E.3d 207, ¶ 32 (8th Dist.), quoting *State v. Westwood*, 4th Dist. Athens No. 01CA50, 2002-Ohio-2445, ¶ 41. However, in this case, we find that the curative instruction was sufficient.

{¶ 65} Notably, the record does not contain a description of the altercation, and we do not know what occurred, who started it, or how long it lasted. The trial court briefly addressed the issue and instructed the jury only to consider the evidence and not what occurred outside of the courtroom. All of the jurors readily agreed that they could do so, and we presume that jurors will follow the instructions of the court. *See State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) ("A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge."). Therefore, we hold that the trial court did not abuse its discretion when it denied appellant's motion for a mistrial.

{¶ 66} Accordingly, appellant's second assignment of error is not well-taken.

### D. Due Process and Racial Bias

{¶ 67} In his sixth assignment of error, appellant asserts that he was denied due process and the equal protection of rights when he was convicted by an all-white jury.

25.

**{¶ 68}** Relevant here, following the announcement of the guilty verdicts, appellant burst out:

MR. FENDERSON: I didn't even have enough time for this case. That ain't even fair, man. That ain't even fair, dog. That ain't even f***in' fair, man, takin' my life for no reason and I just did all that time, man. This is f***in' crazy, man.

* * *

MR. FENDERSON: This is so --

* * *

MR. FENDERSON: -- crazy, man. I just did all that time.

* * *

MR. FENDERSON: I just did all that time, man. I didn't even do nothin', man. I don't bother nobody.

* * *

MR. FENDERSON: That's messed up, man. They took my life, man. They took my life for no reason.

* * *

SPECTATOR: Don't worry about it.

MR. FENDERSON: What did I do? (Inaudible) make me go to Court (inaudible) go to trial (inaudible).

26.

SPECTATOR: I mean, what kind of jury did you have.

MR. FENDERSON: All white, all old.

SPECTATOR: You didn't have a chance. Shoot, they have all white jury. You never get a chance.

{¶ 69} In his brief, appellant does not make an argument in support of this assignment of error, but rather recognizes the precedent set forth in *State v. Williams*, 7th Dist. Columbiana No. 19 CO 0010, 2021-Ohio-718, ¶ 13, as well as many other cases in a similar line, which he notes "allow for the conviction of an African American by an all-white jury."

{¶ 70} "Where an appellant fails to develop an argument in support of his assignment of error, this Court will not create one for him." *State v. Franks*, 2017-Ohio-7045, 95 N.E.3d 773, ¶ 16 (9th Dist.). "If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." (Brackets sic.) *Id.*, quoting *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998).

{¶ 71} Accordingly, because appellant does not advance an argument in support of his assignment of error, appellant's sixth assignment of error is not well-taken.

### E. Sufficiency and Manifest Weight

{¶ 72} In his fifth assignment of error, appellant argues that his convictions are based upon insufficient evidence, and are against the manifest weight of the evidence.

27.

**{¶ 73}** Insufficiency and manifest weight are distinct legal theories, although appellant addresses them together. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶ 74}** Here, appellant was convicted of possession of drugs in violation of R.C. 2925.11(A), which provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Appellant contests that he "possessed" the drugs. "'Possess' or 'possession' means having control over a thing or

28.

substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession may be actual or constructive. "Actual possession occurs when the defendant has the items within his immediate physical control, whereas constructive possession occurs when the defendant is able to exercise dominion and control over an item, even if the individual does not have the item within his immediate physical possession." *State v. Shelby*, 2019-Ohio-1564, 135 N.E.3d 508, ¶ 24 (6th Dist.), citing *State v. Fykes*, 6th Dist. Wood No. WD-07-072, 2009-Ohio-2926, ¶ 36. "In order for constructive possession to exist, there must be evidence demonstrating that the defendant was conscious of the presence of the object. Although a defendant's mere proximity to an item is in itself insufficient to establish constructive possession, proximity to the item may constitute some evidence of constructive possession." *Id.*, quoting *Fykes* at ¶ 36. "A court must look at all of the attendant facts and circumstances in order to determine if a defendant knowingly possessed a controlled substance." *Id.*

{¶ 75} In support of his assignment of error, appellant argues that he did not possess the drugs because the drugs were found in a car belonging to his friend, A.P., and it is reasonable to conclude that A.P. is the owner of the items in the car. Appellant further argues that there is no evidence that he exercised dominion or control over the drugs.

29.

{¶ 76} When looking at all of the attendant facts and circumstances, we find both that the evidence is sufficient to support the conviction, and that the conviction is not against the manifest weight of the evidence. Here, Rotuno engaged in a text message conversation with Joseph's suspected drug dealer, and set up a potential drug transaction. Immediately after the suspected drug dealer messaged, "Here I come," appellant was observed leaving the Tims and driving to the Convenient Store where the transaction was to take place, with a phone in his hand. Appellant was the only occupant of the vehicle. When appellant arrived at the store, he waited in his car for 20-30 seconds, and then went to the front door of the Convenient Store and looked inside, as if he was looking for someone. As appellant walked back to his car, he noticed Rotuno. Appellant then continued walking past the running car. When he was stopped, appellant lied, and denied that he was driving the car. Rotuno then called the phone number that he had texted to set up the drug transaction, and appellant's phone rang. Inside of the car, in plain view on the center console were pressed pills packaged for sale, which were virtually identical to the pills that were found in the pocket of the pants that Joseph was wearing on the night that he died.

{¶ 77} From this evidence, it is clear that appellant exercised dominion and control over the pills, which he brought with him for the apparent purpose of selling them to who he believed was Joseph. Therefore, we hold that appellant's conviction for

30.

possession of drugs is not based on insufficient evidence, nor is it against the manifest weight of the evidence.

{¶ 78} Appellant was also convicted of trafficking in drugs in violation of R.C. 2925.03(A)(1), which states, "No person shall knowingly do any of the following: (1) Sell or offer to sell a controlled substance or a controlled substance analog." Appellant argues that the state did not prove that he sold or offered to sell the drugs because none of the text messages mentioned drugs or an amount of money for a transaction. Moreover, appellant argues that a drug transaction never occurred.

{¶ 79} Despite appellant's protestations to the contrary, the text messages in this case do support an offer to sell. The messages identified the drug as "same as last," and identified an amount as $200. The messages further established a meeting time and location for the transaction. From the context of the messages, the only reasonable conclusion to be drawn is that the parties were organizing a meeting for the purpose of engaging in a drug transaction. No other alternative explanation was given or suggested. This conclusion is confirmed by the fact that appellant arrived at the meeting location with drugs packaged for sale. Therefore, we hold that appellant's conviction for trafficking in drugs is not based on insufficient evidence, nor is it against the manifest weight of the evidence.

{¶ 80} Finally, appellant was convicted of corrupting another with drugs in violation of R.C. 2925.02(A)(3), which states, "No person shall knowingly do any of the

31.

following:  * * * (3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."  Appellant argues that there is no evidence linking drugs sold by him to Joseph's death.  Appellant points to the text message sent shortly before Joseph died, where Joseph said "I'mma come meet chu I only need 2 for now."  However, after Joseph died, two pills were found in Joseph's pocket.  Appellant contends that the state cannot show that Joseph died from pills that were still in his pocket.

{¶ 81} Upon review, we find that the evidence is sufficient to support the conviction, and that the conviction is not against the manifest weight of the evidence. Here, although Joseph only mentioned that he needed "2" in his text message, we note that he and appellant spoke on the phone for four minutes.  It is not unreasonable to conclude that Joseph messaged appellant stating that he needed drugs because Joseph did not have any at the time.  Joseph then obtained the same type of drugs that were found in appellant's car after appellant responded to the request for the "same as last."  Finally, Joseph died from fentanyl toxicity shortly after ingesting the drugs, and the pills provided to Joseph from appellant contained fentanyl.

{¶ 82} When viewing this evidence in a light most favorable to the prosecution, we find that a rational trier of fact could conclude beyond a reasonable doubt that appellant provided the drugs to Joseph that killed him.  Likewise, sitting as a thirteenth

32.

juror, we find that the jury did not clearly lose its way and create a manifest miscarriage of justice when it found the same. Therefore, we hold that appellant's conviction for corrupting another with drugs is not based on insufficient evidence, nor is it against the manifest weight of the evidence.

{¶ 83} Accordingly, appellant's fifth assignment of error is not well-taken.

### F. Merger

{¶ 84} Finally, in his first assignment of error, appellant argues that the trial court erred when it failed to merge his convictions for possession of drugs and trafficking in drugs.

{¶ 85} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects against, among other things, multiple punishments for the same offense. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. R.C. 2941.25(A) codifies that protection, and provides, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." We review the trial court's determination under R.C. 2941.25(A) de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1.

{¶ 86} In this case, appellant argues that his convictions for possession of drugs and trafficking in drugs constituted allied offenses of similar import, and should have

33.

been merged at sentencing. The state, for its part, agrees, noting that both convictions involved the same drugs from the same transaction, that there was no evidence appellant intended to retain a portion of the drugs for his own personal use, that the victim of both offenses was society in general, and that the harm from the offenses was not separate and identifiable. We concur, and we hold that the trial court erred when it failed to merge appellant's convictions for possession of drugs and trafficking in drugs.

{¶ 87} Accordingly, appellant's first assignment of error is well-taken.

## IV. Conclusion

{¶ 88} For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgment of the Erie County Court of Common Pleas is affirmed, in part, and reversed, in part. Appellant's sentences for possession of drugs and trafficking in drugs are reversed, and the matter is remanded to the trial court for resentencing on those offenses in accordance with this decision. The judgment of the Erie County Court of Common Pleas is affirmed in all other respects. Pursuant to App.R. 24, the parties are ordered to split the costs of this appeal evenly.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.         _____
                                                                                            JUDGE
Christine E. Mayle, J.        

Myron C. Duhart, P.J.         _____
CONCUR.                                                                     JUDGE


                                                                      _____
                                                                                            JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.