[Cite as *State v. Mitchell*, 2026-Ohio-1492.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

Anthony Mitchell

    Appellant

Court of Appeals No.  {48}L-25-00050

Trial Court No.  CR0202401484

**DECISION AND JUDGMENT**

Decided: April 24, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant Anthony Mitchell appeals his conviction in the Lucas County
Court of Common Pleas on counts of aggravated murder, murder, felonious assault,
aggravated burglary, and strangulation.  For the reasons that follow, the trial court's
judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} The Lucas County Grand Jury initially returned a five-count indictment against Mitchell in case No. CR202401399, charging him with aggravated murder, murder, felonious assault, aggravated burglary, and strangulation.

{¶ 3} On March 28, 2024, it re-indicted Mitchell in the underlying case on appeal, case No. CR202401484, on one count of aggravated murder in violation of R.C. 2903.01(B) and (G), an unspecified felony; one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a felony of the second degree; one count of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), a felony of the first degree; and one count of strangulation in violation of R.C. 2903.18(B)(1) and (C), a felony of the second degree. The State later dismissed case No. CR202401399.

{¶ 4} At Mitchell's arraignment on April 4, 2024, in case No. CR202401484, defense counsel noted that he had filed a discovery request and a request for a bill of particulars in the previous case, and he asked to have those motions transferred to the new case. The trial court agreed and stated that "the motion for discovery and the motion for a bill of particulars is now, so it does not need to be re-filed, will now be transferred to 24-1484." The trial court's April 4, 2024 docket entry similarly reflects that "Defendant's Motion for Discovery and Bill of Particulars on case CR24-1399 shall be transferred to this case." Those motions, however, were not included in the record in CR202401484, nor was the State's response to the request for the bill of particulars,

2.

which the trial court's online docket shows was filed on April 3, 2024, in case No. CR202401399. Notably, the record contains no objection from Mitchell as to the bill of particulars provided by the State.

{¶ 5} Ultimately, the matter proceeded to a jury trial. At the trial, the State provided the following testimony and evidence.

{¶ 6} On Monday, December 18, 2023, C.W. placed a 911 call in which she reported that she found her mother, M.B., deceased in her apartment at 490 Martin Lane in Toledo, Ohio. C.W. stated in the call that M.B. was on the floor on the side of her bed and there was blood everywhere. She was unsure how long her mother had been there, and she had last spoken with her mother several days earlier on Friday.

{¶ 7} At trial, C.W. described her mother as a very loving person who loved to garden and cook. C.W. also stated that M.B. enjoyed doing her fingernails and was always painting and manicuring them.

{¶ 8} M.B. had lived in her apartment for approximately ten years and had known and become friends with most of her neighbors. C.W. identified Mitchell as being one of M.B.'s neighbors back in 2015. Mitchell's mother still lived next to M.B.

{¶ 9} C.W. testified that she spoke with her mother nearly every day. The last time that she talked with her was Friday, December 15, 2023, at approximately 2:00 in the afternoon. M.B. said that she would call C.W. later that day, but she never did. C.W. tried calling M.B. on Friday evening, Saturday, Sunday, and Monday morning, but the phone call went to voicemail. When C.W. received a message on Monday from one of

3.

M.B.'s friends who also could not reach M.B., she left her work and drove to her mother's apartment.

{¶ 10} When C.W. arrived at the apartment, the door was unlocked, which was customary. C.W. testified that M.B. always left her doors unlocked and allowed people to come into her apartment because she was an alcoholic and crack cocaine addict and she offered her apartment as a place that people could come and use drugs. C.W. stated that everyone liked M.B.

{¶ 11} Upon entering the apartment through the side door, C.W. did not notice that anything was taken from the apartment. C.W. found her mother in her bedroom, lying on her back on the floor between the bed and the wall, where the bed was normally pushed up against the wall. There was a wine glass on the bed and blood all over the bed and wall. C.W. called 911. During the call, someone asked her to touch her mother. C.W. testified that she touched her mother's leg and it was cold.

{¶ 12} On cross-examination, C.W. testified that shortly after her mother was killed, she suspected that her mother's friend "Jim" could have been the murderer. Jim lived in Genoa and had known M.B. for over 30 years. C.W. described Jim as a "[b]ig, heavy man" who was around 5'8" tall and weighed at least 300 pounds. Jim used to be at M.B.'s apartment quite often and was the main person to visit the apartment. He had seen M.B. two weeks prior to her death. On redirect, C.W. explained that she considered Jim a suspect based on some conversations that she had with family members and M.B.'s friends.

4.

{¶ 13} The State next called Stacy Violi, a forensic scientist at the Ohio Bureau of Criminal Investigation ("BCI"). Violi conducted DNA analysis on a knife, M.B.'s bedsheet, her shirt, and swabs from M.B.'s hands and fingernail clippings. She did not receive any DNA samples from the wine glass, a cigarette lighter, or a crack pipe that were also at the crime scene. She compared the analysis to standards from M.B., C.W., and Mitchell. The knife only contained DNA consistent with M.B. The bedsheet, shirt, and swabs of the left and right hands contained a mixture of DNA, with M.B. being the major contributor, and the remaining DNA being unsuitable for comparison. The fingernail clippings from the right hand just had DNA consistent with M.B. The fingernail clippings from the left hand, however, had a mixture of DNA, with M.B. being the major contributor and Mitchell being the minor contributor. Violi testified that she would not expect the minor DNA profile to occur in more than one in one trillion individuals. She also testified that it is very rare to find foreign DNA under someone's fingernails, and it usually only occurs when there is a struggle and the victim scratches the assailant. Moreover, she testified that the presence of DNA would be affected by a person washing her hands, taking a shower, cleaning the house, or getting her nails done.

{¶ 14} Cherokee Tabb testified next for the State, and his body camera video was played for the jury. Tabb was one of the Toledo Police officers who responded to M.B.'s apartment following the 911 call. At the scene, Tabb observed a plastic bag consistent with the packaging for drugs, as well as drug paraphernalia including crack pipes. One of the crack pipes was on the ground almost directly next to M.B.'s body. His initial

5.

consideration that the death could have been a drug overdose changed, however, when someone from the coroner's office moved the body and he observed a large laceration to the base of M.B.'s head.

{¶ 15} Tabb testified on cross-examination that he interviewed J.T. and M.C., who were the occupants of the unit that shared a wall with M.B.'s apartment. From those neighbors, he learned that several males had visited M.B.'s apartment in the days leading up to her death, one of whom came to the apartment almost every day around 7:00 a.m. J.T. reported that he regularly heard arguing between M.B. and a male. The neighbors never specifically mentioned that Mitchell was one of the males who visited the apartment or who was arguing with M.B.

{¶ 16} Javier Ramirez, who is part of the crime scene unit for the Toledo Police Department, authenticated photos taken of the crime scene. He testified on cross-examination that he did not collect an open pop can on the living room table, nor did he collect a cigarette lighter or used cigarette butt that were on the floor near M.B. He also did not collect the wine glass or a used water bottle. Ramirez determined that those items were commonplace items.

{¶ 17} James Gross, the president of public safety for Lucas Metropolitan Housing, authenticated video surveillance taken near M.B.'s apartment. The video shows a shadow of a person entering M.B.'s apartment at approximately 4:20 a.m. on December 16, 2023. An individual then leaves her apartment at approximately 4:52 a.m., another person leaves at 5:07 a.m., and another person leaves at approximately 7:42 a.m. All of

6.

the individuals appear to be normal-sized males. None can be seen closely enough to determine any identifying physical characteristics.

{¶ 18} The State next called Dr. Dwayne Wolf, a deputy coroner for Lucas County, to testify. Dr. Wolf performed an autopsy of M.B. on December 19, 2023. Relevant here, pictures of M.B.'s left hand taken during the autopsy showed that her fingernails were well manicured, painted and trimmed.

{¶ 19} In his findings, Dr. Wolf observed post-mortem ant bites on M.B.'s body as well as several other markers that indicated her body had begun the process of decomposition. He concluded that while the official date of death was December 18, 2023, when M.B.'s body was discovered, she in fact had been dead "for a while."

{¶ 20} During his autopsy, Dr. Wolf identified four different sharp force injuries, specifically four incised wounds. Three of the wounds were on her neck, and the middle one was the largest at approximately five inches long. It went through the cartilage of M.B.'s larynx and thyroid between the trachea and the voice box.

{¶ 21} In addition, Dr. Wolf testified to what he described as a "completely different injury" of a fracture to M.B.'s thyroid cartilage in an area different from where the knife went. The fracture indicated compression of the neck as seen in strangulation or hanging. Dr. Wolf also observed petechia—which is evidence of the popping of small blood vessels—in her eyes and the undersurface of the eyelids. Dr. Wolf testified that this is consistent with someone applying between four and 11 pounds of pressure to the neck because it would not be enough pressure to stop blood from entering the head, but it

7.

would be enough to stop it from leaving the head, leading to the popped blood vessels. Dr. Wolf testified that when the petechia is combined with the fractures to the greater horn of the thyroid cartilage, "it's pretty clear that she had significant compression of her neck."

{¶ 22} A toxicology report was also performed on M.B. It showed evidence of alcohol and cocaine usage. Dr. Wolf testified, however, that her drug usage did not contribute to her death.

{¶ 23} He determined, instead, that her cause of death was "[s]harp force injuries of the neck with strangulation." Dr. Wolf noted that sharp force injuries and strangulation "are obviously two totally different things, and I can't tell which came first." He testified that it was conceivable that the two happened at the same time, but it was also conceivable that M.B. was strangled before the sharp force injuries occurred. He also stated that the majority of strangulations are nonfatal and it would take a complete occlusion of the carotid artery to cause death within several minutes. In this case, the carotid artery was not completely occluded as evidenced by the petechia in M.B.'s eyes. Dr. Wolf testified that the physical mechanism of M.B.'s death was loss of blood with a component of respiratory failure associated with the blood going down her windpipe.

{¶ 24} The final witness to testify was Detective Gary Bunting of the Toledo Police Department, who described the extent of his investigation. Bunting initially viewed everyone as a potential suspect. He spoke with a couple of M.B.'s neighbors and

8.

those neighbors described that M.B. often had people coming and going from her apartment. He also spoke with C.W., who mentioned that M.B. had argued with a female neighbor and they each messed with the other's property, but neither one had ever physically attacked the other. C.W. also mentioned a man named "Jim."

{¶ 25} Bunting reviewed the surveillance video and pointed out when people were leaving M.B.'s apartment in the early morning hours of December 16, 2023. He testified, however, that the surveillance video only showed the front door, and he could not see if people were entering or exiting through the side door.

{¶ 26} Bunting also interviewed J.T., the same person that Tabb had interviewed on the day M.B.'s body was discovered. Bunting noted that J.T. lived in his grandmother's apartment at 482 Martin Lane, and his grandmother's last name was Mitchell. According to Bunting, J.T. gave a lot of information that did not go anywhere. He mentioned a female named Sonia. He also mentioned a person named "Greg," who used to visit M.B., and who was last at the apartment on December 14, 2023. In February 2024, J.T. reported finding a knife in the bushes that he believed was used to kill M.B. The knife was collected, but Bunting did not consider it to be the murder weapon because he already had in his possession the knife from the crime scene that was covered in M.B.'s blood. Given the poor information provided by J.T. and his reporting of the knife, Bunting suspected that J.T. was trying to divert the investigation in a certain direction.

9.

{¶ 27} Bunting additionally testified that he interviewed S.N., a cousin of J.T.[1] S.N. was "smoking buddies" with M.B. He described that M.B. had been closed off for the last several months, and he mentioned a person named "Greg," that kept coming over to her apartment.

{¶ 28} Bunting eventually was able to speak with "Greg." Greg stated that he had known M.B. for approximately 13 years but had not seen her since four to five weeks before her death. On cross-examination, Bunting admitted that he did not take any steps to verify whether Greg was telling the truth or whether he was in the same location as M.B. at the time of her death.

{¶ 29} Once Bunting received notice that the DNA that was found underneath M.B.'s left fingernails matched a database entry for Mitchell, he requested an interview with him. Notably, J.T., M.C., S.N., and "Jim" also had DNA in the database, but there was no match.

{¶ 30} During the interview that took place in March 2024, Mitchell stated that he was currently residing at his mother's apartment at 482 Martin Lane, although he frequently stays with his "girl" at a different location. Bunting assumed that there was a familial relationship between Mitchell and J.T., but he did not identify the exact relationship.

---

[1] S.N. went by an alias A.A.

{¶ 31} A recording of the interview was played for the jury. In the interview, Mitchell stated that he was last in M.B.'s apartment on Thanksgiving Day when he did drugs with her. The last time he saw her was on December 1, 2023, when he stopped at his mother's apartment and M.B. was outside feeding her cats. Mitchell described M.B. as "too cool" for anyone to have problems with her. He noted that she was like family, and his mom, his sisters, and his nephews were all "cool" with her.

{¶ 32} Later in the interview, Mitchell admitted that M.B. had given him oral sex sometime over the summer. M.B. then started texting Mitchell. Mitchell said that his wife saw the texts. When M.B. started messaging that she missed Mitchell and wanted to do that again, Mitchell "cut that short" and he made clear it was a one-time thing.

{¶ 33} Bunting then asked Mitchell where he was when M.B. was killed. Mitchell responded that he was on Vance Street, getting high. When asked how he knew that he was on Vance, Mitchell replied that he was on Vance talking to his friend "Beanhead," and that he left around 6:00 a.m. He did not remember what day that was, but he remembered that he was there the night before. He said that his mother called him later that day and told him to come over. When he and his wife arrived at her apartment, Mitchell's mother told them that M.B. had died.

{¶ 34} Bunting testified that Mitchell's response was interesting because he said that he was on Vance until 6:00 a.m., but the police did not find the body until 3:40 p.m. and no one had been informed of what time the police believed that M.B. had died.

Bunting posited that a person who was not involved in M.B.'s death would have not have any idea when she died.

{¶ 35} Bunting also noticed that Mitchell had a scar near his right eye that was not present in photographs of him taken six months earlier. He surmised that the presence of Mitchell's DNA under the fingernails of M.B.'s left hand could be explained by her scratching his right eye. He admitted on cross-examination, however, that he did not know when or how Mitchell received that scar, and it could have occurred sometime after M.B. died.

{¶ 36} Before and after photographs of the scar were entered into evidence. Notably, video evidence of when the detectives took the picture of the scar was also played for the jury. The detectives had obtained a warrant for the picture, and it was executed at the jail where Mitchell was being held. Mitchell was belligerent and uncooperative and had to be restrained by jail staff for the picture to be taken. Mitchell expressed that he did not want his picture on the news.

{¶ 37} After Bunting's testimony, the State rested. Mitchell moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. He then rested without presenting any evidence.

{¶ 38} Following closing arguments and jury instructions, the jury returned with a verdict of guilty on all counts.

12.

{¶ 39} At sentencing, the State took the position that the counts of aggravated murder, murder, felonious assault, and aggravated burglary would merge, with the State electing to proceed to sentencing on the count of aggravated murder. The State argued that the count of strangulation did not merge. Defense counsel made no argument against the State's position. The trial court thereafter sentenced Mitchell to life in prison with the possibility of parole after 25 years on the count of aggravated murder, and to an indefinite term of 7 to 10 1/2 years on the count of strangulation. The trial court further ordered those sentences to be served consecutively.

## II. Assignments of Error

{¶ 40} Mitchell timely appeals his judgment of conviction, asserting four assignments of error for review:

1. There was insufficient, competent credible evidence to support appellant's convictions.

2. Appellant's right against double jeopardy was violated where there was a second conviction for the same act, and where the convictions for strangulation and aggravated murder should merge.

3. The State failed to produce a bill of particulars in compliance with Crim.R. 7, where it did not set out the nature of the charges and conduct alleged.

4. Appellant was deprived of effective assistance of counsel at trial and sentencing, where his trial counsel failed to put forth important challenges and did not consider appellant's concerns.

13.

### III. Analysis

### A. Sufficiency and Manifest Weight

{¶ 41} In his first assignment of error, Mitchell argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence.

{¶ 42} "Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.).

{¶ 43} "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 44} In contrast, when reviewing a manifest weight claim,

"[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.*, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 45} Here, Mitchell argues insufficiency and manifest weight together. He does not contend that the elements of the crimes were not satisfied. Rather, he maintains that the evidence does not establish his identity as the person who committed the crimes.

14.

{¶ 46} Specifically, he argues that the investigation effectively ended when his DNA was found under M.B.'s fingernails. He asserts that several leads were not followed, such as looking into Jim, Greg, and the neighbor with whom M.B. had ongoing arguments. Furthermore, Mitchell highlights that relevant pieces of evidence were not collected or tested for DNA, including the used cigarette butt, crack pipe, cigarette lighter, and wine glass that were near M.B.'s body, as well as the open pop can that was in the living room. In addition, swabs were not taken of M.B.'s neck where she was strangled. He contends that this information could have produced a fuller picture of the events surrounding M.B.'s death, and without that information there is not competent, credible evidence supporting his convictions.

{¶ 47} Upon review, there is sufficient evidence in the record to support Mitchell's convictions. Of primary importance is the presence of his DNA underneath M.B.'s fingernails. Violi testified that it is uncommon to find foreign DNA underneath a person's fingernails, and it usually is found where the victim has scratched the assailant. In addition, Violi testified that the presence of DNA would be impacted by activities such as washing hands, taking showers, cleaning around the house, or manicuring the nails. The fact that M.B.'s nails were clean and well-manicured supports the conclusion that Mitchell's DNA only recently came to be located under her fingernails. Further, the explanation that Mitchell's DNA was acquired when M.B. scratched his face is corroborated by the scar near Mitchell's right eye that was not present in September 2023.

15.

{¶ 48} The recent presence of Mitchell's DNA under M.B.'s fingernails is also in conflict with his statement to Bunting that he was last with M.B. on Thanksgiving 2023 and last saw her on December 1, 2023, approximately two weeks before the murder. Based on Violi's testimony, it is not believable that Mitchell's DNA would remain present and identifiable two weeks later. The jury could reasonably conclude, therefore, that Mitchell was lying to Bunting during the interview.

{¶ 49} Moreover, Mitchell's explanation that he was on Vance Street when M.B. was killed and that he did not leave there until 6:00 a.m. is also suspicious given that M.B.'s body was not found until the afternoon of December 18, 2023, she had been dead for some time, and the police did not know and had not mentioned when they believed she was murdered.

{¶ 50} Taken together, and when viewed in a light most favorable to the prosecution, the evidence is sufficient for a rational juror to have found beyond a reasonable doubt that Mitchell was the person who murdered M.B.

{¶ 51} Likewise, this is not the exceptional case where the evidence weighs heavily against the conviction. Mitchell's complaint is not that there are conflicts in the evidence or that there is significant evidence of his innocence. Rather, he argues that there is a lack of evidence of his guilt. He contends that evidence from the crime scene remained unexamined, and other suspects were not investigated fully. As discussed above, however, the evidence is sufficient to prove that Mitchell was the assailant. And there is no evidence tying any of the other purported suspects to the crimes other than

16.

pure speculation by the victim's daughter and by neighbors, some of whom, as in the case of J.T. and S.N., are related to Mitchell. In this case, the only person whose DNA was found on M.B.'s body was Mitchell, and no explanation was given as to how it could have gotten there other than by M.B. scratching Mitchell as he attacked her. The jury, therefore, did not lose its way and create a manifest miscarriage of justice when it found Mitchell guilty of the crimes.

{¶ 52} Accordingly, Mitchell's first assignment of error is not well-taken.

## B. Merger

{¶ 53} In his second assignment of error, Mitchell argues that the trial court erred when it failed to merge the offense of aggravated murder with the offense of strangulation.

{¶ 54} Mitchell failed to request merger of the two counts at sentencing. He, therefore, has forfeited all but plain error. *State v. Knuff*, 2024-Ohio-902, ¶ 218; *State v. Rogers*, 2015-Ohio-2459, ¶ 28; *State v. Hoffman*, 2025-Ohio-4609, ¶ 14 (6th Dist.).

{¶ 55} "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice." *State v. Bailey*, 2022-Ohio-4407, ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail, Mitchell "must establish that 'an error occurred, that the error was obvious, and that there is "a reasonable *probability* that the error resulted in prejudice," meaning that the error affected the outcome of the trial.'" (Emphasis sic.) *Id.*, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *Rogers* at ¶ 22. "The

17.

elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention." *Id.* at ¶ 9, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 56} For the first element, there must be an error. Here, the alleged error is that the trial court failed to find that the offenses of aggravated murder and strangulation should have merged at sentencing.

{¶ 57} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibit multiple punishments for the same offense." *State v. Rogers*, 2022-Ohio-4126, ¶ 16 (6th Dist.). That section provides,

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 58} The test for determining whether allied offenses should be merged is well-established:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they

18.

committed separately?  and (3) Were they committed with separate animus or motivation?  An affirmative answer to any of the above will permit separate convictions.  The conduct, the animus, and the import must all be considered.

*Bailey* at ¶ 10, quoting *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31.  "The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act."  *State v. Washington*, 2013-Ohio-4982, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67 (1987); *State v. Smith*, 2023-Ohio-866, ¶ 10 (6th Dist.).

{¶ 59} Here, Mitchell was found guilty of aggravated murder in violation of R.C. 2903.01(B), which provides, "No person shall purposely cause the death of another . . . while committing or attempting to commit . . . kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape."  He also was found guilty of strangulation in violation of R.C. 2903.18(B)(1), which states, "No person shall knowingly do any of the following:  (1) Cause serious physical harm to another by means of strangulation or suffocation."

{¶ 60} Mitchell maintains that the record does not show that the two offenses were committed separately or with a separate animus, stating that the criminal conduct in this case was one course of action done with the purpose of killing M.B.  He additionally asserts that the offenses had a similar import in that M.B. was killed by several means, including strangulation.

19.

{¶ 61} Upon review, the offenses do not merge because they had dissimilar import. "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *State v. Ruff*, 2015-Ohio-995, ¶ 23.

{¶ 62} Here, Dr. Wolf testified that the strangulation resulted in a "completely different injury" than the knife cuts. He later noted that the strangulation and the sharp force injuries "are obviously two totally different things." The evidence of strangulation was at a different part of M.B.'s neck, and it included a fracture to her thyroid cartilage and observable instances of petechia. Dr. Wolf testified that the majority of strangulations are nonfatal, and it would take a complete occlusion of the carotid artery to cause death within several minutes. In this case, however, the carotid artery was not completely occluded as evidenced by the petechia in M.B.'s eyes.

{¶ 63} The record demonstrates, therefore, that the harm resulting from the strangulation, namely the broken thyroid cartilage and petechia, was separate and identifiable from the knife cuts that resulted in M.B.'s loss of blood and corresponding respiratory failure caused by the blood going down her windpipe, which ultimately led to her death. *See State v. Asbury*, 2017-Ohio-1005, ¶ 28 (11th Dist.) (Strangulation and stabbing were of dissimilar import. "The act of strangulation caused her to lose consciousness, while the multiple stab wounds left deep gashes in her flesh causing her to bleed profusely; while the former arguably facilitated the latter, the harm is

20.

fundamentally distinguishable."). As such, Mitchell has failed to satisfy his burden to prove that he is entitled to the protection against double jeopardy. The trial court did not err when it failed to merge the offenses of aggravated murder and strangulation.

{¶ 64} Accordingly, Mitchell's second assignment of error is not well-taken.

### C. Bill of Particulars

{¶ 65} In his third assignment of error, Mitchell argues that the State failed to comply with Crim.R. 7(E) when it produced an inadequate bill of particulars.

{¶ 66} "Upon written request by a defendant, the prosecuting attorney must furnish the defendant with a bill of particulars specifically setting forth the nature of the offense charged and the conduct of the defendant alleged to constitute the offense." *State v. Haynes*, 2022-Ohio-4473, ¶ 28; R.C. 2941.07; Crim.R. 7(E).

{¶ 67} Mitchell asserts that the bill of particulars in this case was simply a regurgitation of the indictment with additional citations to specific discovery material. He maintains that the bill of particulars failed "to set forth more fully the details of the nature of the offense and the conduct for which appellant was charged." Ironically, Mitchell does not provide any details as to how he was prejudiced by the State's alleged failure, instead stating broadly that "had the bill of particulars been compliant with Crim.R. 7(E), his counsel below and on appeal would have been better (able) to prepare a defense and to argue merger applies because the language of the bill of particulars would have set forth the nature and conduct and that the same alleged conduct by appellant must be construed to constitute two allied offenses of similar import."

21.

{¶ 68} As the State points out, however, the bill of particulars in this case was not included in the record on appeal and this court has nothing to review. Nevertheless, the State does concede Mitchell's characterization of the bill of particulars as the language of the indictment plus the statement "as detailed in the summary report of police investigation dated 12/18/23 authored by Officer Wymer and Tabb and provided to Defendant in discovery." The summary report is likewise not in the record.

{¶ 69} In support of his position, Mitchell relies on *State v. Haynes*, 2022-Ohio-4473, in which the Ohio Supreme Court vacated a conviction because the State failed to produce a bill of particulars. In doing so, it abrogated 23 different appellate court decisions. In that case, Haynes "was indicted for the abduction of his grandchildren who lived and stayed with him after his unmarried daughter died of a drug overdose and her boyfriend sought to claim custody of them." *Id.* at ¶ 1. The indictment stated that "[o]n or about December 21, 2017 to December 27, 2017," Haynes "did, without privilege to do so, knowingly, by force or threat, remove [his grandchild] from the place where [his grandchild] was found." *Id.* at ¶ 5.

{¶ 70} Haynes requested a bill of particulars, but the State did not provide one, instead providing open-file discovery. Haynes then moved the trial court to compel the State to produce a bill of particulars, arguing that "the State of Ohio has refused to provide discovery to the Defendant or otherwise specify in a Bill of Particulars what force or threat was used to remove the children . . .." *Id.* at ¶ 7. The trial court denied the motion to compel. It was not until closing arguments that Haynes learned that the State

22.

believed he "abducted the children when, with knowledge that [the biological father] had obtained temporary custody, [he] picked the two children up from [a family member's] home on December 19 and had his wife pick up one child from school," and that he "used force when he buckled the children into their car seats and that he also used force in the sense that a child does not realistically have any ability to resist when a grandparent decides to take him somewhere." *Id.* at ¶ 14.

{¶ 71} On appeal, the Ohio Supreme Court highlighted the need for a bill of particulars in that case:

> The charges against Haynes were exceedingly vague. With regard to each child, the indictment alleged only that "[o]n or about December 21 to December 27, 2017," Haynes "did without privilege to do so, knowingly, by force or threat, remove [his grandchild] from the place where [his grandchild] was found." Under the evidence submitted by both the state and the defense, the boys stayed with Haynes on December 18, stayed with the Deckers (two of the boys) and at school (one of the boys) for part of the next day, and then were picked up by Haynes and his wife later that day. They thereafter traveled, on December 22, to the home of extended family members for Christmas, and Haynes and his wife stayed there with the children until Haynes's arrest on December 27, 2017. What incident during that time constituted "remov[ing]" the grandchildren "from the place where [they were] found," by "force or threat," "knowingly," and "without privilege to do so"? Was it picking them up at the Deckers' house, even though the pick-up from the Deckers happened on December 19 and therefore was not within the specified time frame of the indictment prior to its amendment on the morning of trial? Was it the pick-up from school, even though Haynes was not the one who picked up the boy who was at school and even though Haynes and his wife regularly picked the children up from school? Was it taking the boys to see their other family members for Christmas? Was it any other errand or outing they took the children on during the week they were together? Which was being alleged, force or threat? If force was being alleged, what was the alleged force? Was it the mere act of transporting the children? Was it buckling them into the seats of the car?

*Id.* at ¶ 21. It then reasoned that Article I, Section 10, of the Ohio Constitution, Crim.R. 7(E), and R.C. 2941.07 all require that the State provide a bill of particulars upon request, and it rejected "caselaw of intermediate courts of appeal holding that even though Crim.R. 7(E) plainly sets forth a mandatory duty to provide a bill of particulars, that duty evaporates when full discovery is provided." *Id.* at ¶ 22. The Ohio Supreme Court therefore pronounced the rule that "[u]pon written request by a defendant, the prosecuting attorney must furnish the defendant with a bill of particulars specifically setting forth the nature of the offense charged and the conduct of the defendant alleged to constitute the offense." *Id.* at ¶ 28. Finally, in reversing the court of appeals and the trial court, the Ohio Supreme Court considered the State's argument that the failure to provide a bill of particulars was harmless, but it held that the State had failed to show that it was "harmless beyond a reasonable doubt." *Id.* at ¶ 25.

{¶ 72} The present case is distinguishable from *Haynes*. First, unlike *Haynes*, the State did provide a bill of particulars. Furthermore, Mitchell did not object. He, therefore, has waived all but plain error. *State v. Bonner*, 2024-Ohio-4717, ¶ 33 (6th Dist.). This leads to the second distinguishing factor: Mitchell has not demonstrated any prejudice.

{¶ 73} In *Bonner*, this court held that the bill of particulars provided by the State did not constitute plain error. The bill of particulars in that case, like here, restated the language of the indictment. *Id.* at ¶ 34. This court noted that "[n]ot every case requires a

24.

bill of particulars. Sometimes an indictment tells a defendant all the defendant needs to know to understand exactly what is alleged." *Id.*, quoting *Haynes* at ¶ 26. There, the bill of particulars identified "the perpetrator, the victim, the date, and the elements, as to each offense." *Id.* at ¶ 36. In concluding that Bonner failed to show prejudice, this court reasoned that he did not provide any details about the bill of particulars, nor did he "articulate *how* they were inadequate or defective." (Emphasis sic.) *Id.* at ¶ 35. This court concluded, "In the absence of any evidence showing that the bills were inadequate or that he was prejudiced by them, Bonner cannot show plain error." *Id.* at ¶ 36.

{¶ 74} The same is true in this case. The bill of particulars identifies the perpetrator, the victim, the date, and the elements of each offense. Mitchell has not provided any details about the summary report authored by Officers Wymer and Tabb that was referenced in the bill of particulars. Nor does he attempt to explain in any way how the bill of particulars were inadequate or defective. In the absence of such a showing, Mitchell cannot demonstrate plain error.

{¶ 75} Accordingly, his third assignment of error is not well-taken.

### D. Ineffective Assistance

{¶ 76} Finally, in his fourth assignment of error, Mitchell argues that he received ineffective assistance of trial counsel. He lists as examples, without providing substantive argument, trial counsel's failure to raise issues such as "[him] not being mirandized, him not having counsel at arraignment at the Toledo Municipal Court, his two convictions not merging at sentencing, and, such as, the state not producing an

25.

adequate bill of particulars in compliance with Crim.R. 7(E)." He claims that due to counsel's errors, he did not receive a fair trial or sentencing. He further asserts that, at minimum, had trial counsel raised the issues of merger and the bill of particulars he would have been in a better position for this court to consider the merits of his arguments without the stricter standard of plain error.

{¶ 77} To demonstrate ineffective assistance of counsel, Mitchell must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). That is, he must show (1) "that his counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

{¶ 78} Commensurate with the level of argument provided by Mitchell, this court will briefly address each of his four proposed instances of ineffective assistance of counsel.

{¶ 79} First, *Miranda* is required only where there is a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In this case, Mitchell was not in custody. The detectives informed him at the beginning of the interview that he was not in custody or under arrest and that he was free to leave at any time. Moreover, after Mitchell

26.

consented to a buccal swab but before he began speaking about where he was on the day that M.B. was murdered—and even though there was no indication that Mitchell was no longer free to leave or that he was under arrest—Detective Bunting did, in fact, inform Mitchell of his rights pursuant to *Miranda*. The record, therefore, demonstrates that Mitchell's rights were not violated.

{¶ 80} Second, the record shows that Mitchell was represented by appointed counsel at his April 4, 2024 arraignment in this case.

{¶ 81} Third, regarding the issue of merger, as discussed in Mitchell's second assignment of error, there was no error in failing to merge the counts of aggravated murder and strangulation because the offenses had dissimilar import.

{¶ 82} Finally, as to the bill of particulars, Mitchell has failed to demonstrate how the bill of particulars was deficient. Further, his argument that he would not have been subject to the plain error standard on appeal had trial counsel objected is unavailing where he makes no effort to demonstrate how the results of the trial court proceedings would have been different if a sufficient bill of particulars had been provided.

{¶ 83} Mitchell, therefore, has not demonstrated sufficient prejudice from any of his proposed instances of ineffective assistance of counsel. Accordingly, his fourth assignment of error is not well-taken.

27.

## IV. Conclusion

**{¶ 84}** For the foregoing reasons, this court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed.  Mitchell is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

_____
JUDGE

Myron C. Duhart, J.

_____
Charles E. Sulek, J.                                      JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.